# EXHIBIT I

DocuSign Envelope ID: 888A90FE-D99C-46B8-85D5-C551FC48C193

# Compensation Terms

Vice President
of Mortgage Lending

Exclusively
prepared for
DAVID ASHMAN

 | The Platform to Double
Your Purchase Business

## Guaranteed Rate Core Values

Here at Guaranteed Rate we strive for the industry leading value proposition for our loan officers, our referral sources and our customers.

### We grow for good.

We intend to be the #1 retail mortgage lender in the country, with the commitment that the more we grow, the more good we will do. We have a grow-for-good metric that measures the impact we have on our customers, referral partners, GR family and the communities that we serve. We encourage each other to live healthy, balanced lives and have a lot of fun doing it!

### We put the customer first.

We believe everyone deserves the same low rates and great service, whether they're a Wall Street big shot or a modest first-time homebuyer. We're absolutely committed to making sure every customer loves working with us so much that they can't wait to refer us to their family and friends.

### We work with the best of the best.

We started the company with this philosophy: Hire the best employees, build business with the best referral partners and work with the best mortgage partners. The best are never satisfied with the status quo, have a burning desire to deliver great results and always satisfy our customers with exceptional service. When you surround yourself with the best, life is great!

### We think big.

We go for it. We are bold in our ideas, pushing beyond what most people believe is possible. We believe in the law of attraction and can accomplish anything through positivity and working together as one team.

### We have grit.

We set meaningful, aggressive goals and tenaciously pursue them day after day, week after week. We accomplish these goals by overcoming obstacles and finding a way to WIN. We are relentless. We never give up. Ever.

### We have an owner's mentality.

We embrace a scrappy, entrepreneurial mindset and work as though we own the company. We never sacrifice long-term health for short-term gains. We are financially disciplined and challenge ourselves to be inventive and self-sufficient in everything we do. We will always invest in what matters to our customers, referral partners, GR family and the communities we serve.

### We take decisive action.

We move fast. We destroy bureaucracy, formality and fear of failure because quick delivery is important for our customers. If we see a problem or opportunity, we jump on it.

We make bold, thoughtful decisions while effectively managing risk and ensuring compliance.

### We demand excellence.

Our daily focus is to have a better value proposition than any other bank or mortgage company in the country for our customers, referral partners and GR family. WE have the highest standards. When we do our jobs with excellence, this business is easy—our referral partners are well served, and our customers keep coming back. Good enough, never is.

### We hold ourselves and others accountable.

We are not victims—we are masters of our fate. We honor the commitments we make and never say, "That's not my job." If we make a mistake, we own it, fix it and move forward. We seek transparency and embrace constructive conflict and criticism in order to learn and grow.

### We give a sh!t.

Being part of the GR family means caring deeply about our work, each other and our company. We take pride in what we do and how we do it. You can't work here unless you give a sh!t.

**The following document contains specific details related to your compensation structure.**

DocuSign Envelope ID: 888A90FE-D99C-46B8-85D5-C551FC48C193



<div style="background:#C0392B;color:white;text-align:center;">

# VICE PRESIDENT OF MORTGAGE LENDING
## COMPENSATION SCHEDULE FOR DAVID ASHMAN

</div>

This Vice President of Mortgage Lending Compensation Plan Schedule (the "**Schedule**") together with the attached Vice President of Mortgage Lending Compensation Plan Terms and Conditions (the "**Compensation Terms**") comprise the Vice President of Mortgage Lending Compensation Plan between you and Guaranteed Rate, Inc. (collectively, the "**Plan**"). The Plan is dated as of **October 6, 2021** and is further subject to those Terms and Conditions of Employment entered into by you and the Company (including any arbitration agreement that is included therein or separately executed between you and the Company) (collectively, the "**Employment Terms**"). The Employment Terms are expressly incorporated by reference into this Plan. This Plan is not effective until you have executed it, and if applicable, any Employment Terms, promissory notes or other documents or agreements required by the Company, and you are licensed as a mortgage loan originator for the Company or qualify for Temporary Authority licensing.

The purpose of this Plan is to identify and confirm your loan pricing, Commissions and other compensation on loans in which the RESPA application date follows the date you are fully qualified to perform licensable activity. All capitalized terms that are not defined in this Schedule shall have the meaning set forth in the Compensation Terms. Except as may otherwise be set forth below, this Schedule supersedes and replaces any prior Compensation Schedules or Addenda you may have with the Company.

<u>Compensation under this Agreement shall at all times comply with applicable law, including the Loan Originator Compensation Rule, 12 CFR § 1026.36(d)-(e). Nothing in this Agreement shall be construed to conflict with applicable law.</u>

You and the Company agree as follows:

## 1. YOUR CORPORATE OBJECTIVE AND LOAN PRICING

| Corporate Objective | Minimum Lock Price for Eligible Loans |
|---|---|
| PAR | PAR at 100.0 |

**Executive Management must approve any change to your Corporate Objective. In no event may your Corporate Objective be changed more than once every 90 days.**

Please see Section III(a) through (c) of the Compensation Terms for more information about your Corporate Objective and Section III(d) for more information about loan pricing.

## 2. YOUR COMMISSIONS

Commissions are paid as an advance and are not earned until the criteria set forth in the Compensation Terms have been satisfied.

### (a) Your Base Commission

Your Base Commission for each Eligible Loan in a purchase transaction that you source and originate and that the Company funds during a calendar month are described in the Table below.

| Monthly Eligible Loan Volume | Amount of Base Commission* |
|---|---|
| $0 - $1,000,000 | 120 Basis Points |
| $1,000,000.01 or more | 125 Basis Points |

**\*Your maximum Base Commission is six thousand five hundred dollars $6,500 per Eligible Loan**

**(b) Your Commission on Brokered Loans**

For purposes of this Schedule, an Eligible Brokered Loan must meet the definition of Eligible Brokered Loan set forth in the Compensation Terms and satisfy the following criteria: (1) you have exhausted all available loan products that the Company offers to the customers because those products do not meet the needs of your customer; (2) you have not improperly steered the consumer to any particular loan product; and (3) the loan has been submitted and approved through the Company's brokered loan submission process.

The Company agrees to pay you a Commission of **fifty (50) Basis Points** on each Eligible Brokered Loan that you originate and is funded by a third-party lender, whether sourced by you or the Company. You will receive this Commission consistent with the Company's funded date, not the date that the loan was funded by the brokered third party. You will not be paid on any loan that does not meet the definition of an Eligible Brokered Loan. Eligible Brokered Loans are not included in your Eligible Loan funded volume for Commission tiering purposes (if applicable).

*Please see Section V(b) of the Compensation Terms for more information about your bonus.*

**(c) Commission Sharing with Your Licensed Sales Assistant**

Your Licensed Sales Assistant(s) identified below will receive Commissions in the amount identified below for each Eligible Loan and Eligible Brokered Loan that: (1) you originate; (2) your Licensed Sales Assistant assists to close; (3) is secured by a subject property located in a state in which you are commonly licensed with your Licensed Sales Assistant; and (4) the Company or the third party lender (as applicable) funds. You and the Licensed Sales Assistant(s) identified below must share the same loan pricing and commission caps. You hereby expressly agree to have your Commissions reduced by the amount of this Commission each applicable pay period to pay your Licensed Sales Assistant(s) this Commission.

| Name | Shared With (if applicable): | Commission Amount Per Eligible Loan or Eligible Brokered Loan |
|------|------------------------------|--------------------------------------------------------------|
| N/A | N/A | N/A |

**(d) Bonus Payments to your Business Development Coordinator**

Your Business Development Coordinator(s) identified below will receive a bonus payment in the amount identified below for each Eligible Loan and Eligible Brokered Loan that: (1) you originate and (2) the Company or the third party lender (as applicable) funds. You hereby expressly agree to have your Commissions reduced by the amount of this bonus payment each applicable pay period to pay your Business Development Coordinator(s) this bonus payment.

| Name | Shared With (if applicable): | Bonus Payment Amount Per Eligible Loan or Eligible Brokered Loan |
|------|------------------------------|-----------------------------------------------------------------|
| Jeanine Miller | George Weiner | $75 |

**(e) Your Recruiting Override**

You will receive a thirty-five Basis Point (35) override on the monthly closed and funded loans of your self-sourced recruits. You must remain employed with the Company and be engaged in loan origination to continue to receive this override.

## 3. YOUR OVERRIDE BONUS

This Override Bonus will be paid on or about the 15th day of the month following the applicable production month. The Company reserves the right to adjust the amount of this Override Bonus each quarter. You will not be paid on any loan that does not meet the definition of an Eligible Loan. You must be employed by the Company on the date the Override Bonus is paid to earn and be eligible to receive it.

You will receive a **thirty-five (35) Basis Point** override bonus on the Funded Eligible Loan Volume for the following Vice President(s) of Mortgage Lending. While this bonus will be paid pursuant to the Company's applicable payroll practices, the Steve Reynolds branch cost center will be responsible for the cost of this override bonus. You will not receive this Override Bonus on any Vice President of Mortgage Lending for whom you are receiving the Recruiting Override described above in Section 2(e).

> Dylan Poage

## 4. BUSINESS DEVELOPMENT ALLOWANCE

This benefit will allow you to grow your business, expand your realtor relationships, plan events and much more.

- **Business Development Allowance**: Based on your expected annual volume numbers, you will be given a quarterly business development allowance of three hundred dollars ($300) per quarter. This can be used for marketing and events pre-approved by the Company and other business development expenses. A complete list of all approved marketing and business development expenses can be found on the Company's intranet. Any unused portion of this allowance will not roll over into the next quarter.

- **Broker Open Allowance**: You are also eligible to receive one hundred twenty dollars ($120) per month that can be put toward broker open events.

- **Reimbursement**: All marketing and events must comply will all federal, state and local laws to be eligible for reimbursement. All marketing and events expenses must be submitted for approval to the Company's Marketing and Compliance departments for approval prior to incurring the expense. Marketing, events and other expenses must be submitted for reimbursement in accordance with the Company's then-current expense reimbursement policies.

## 5. YOUR BENEFITS

In addition to your eligibility for the compensation outlined above, you may participate in the Company's standard employee benefits plans and programs provided you meet all eligibility requirements.

## 6. ARBITRATION/CLASS AND COLLECTIVE WAIVER

Any disputes relating to this Schedule and the Employment Terms are subject to the terms of the mutual arbitration agreement between you and the Company, whether set forth in the Employment Terms or a separate arbitration agreement, which requires you to resolve disputes with the Company on an individual basis through final and binding arbitration.

**By signing below, you agree to the attached Compensation Terms and further agree that this Schedule accurately reflects your understanding of your compensation arrangement. You also understand and agree that, if applicable, you must originate each loan at or above your Minimum Lock Price to be eligible to earn a Commission. This Schedule and any Compensation Terms executed in connection with this Schedule supersede and replace any previous Compensation Schedule or other compensation arrangement you may have with the Company.**

David Ashman
_____
(Print your name here)

DocuSigned by:
*David Ashman*
_____
6614ED9C00C24AD...
(Place your signature here)

11/28/2021
_____
(Date)

Guaranteed Rate, Inc.

DocuSigned by:
_____
EB86DD55071A479...
By: Nikolaos Athanasiou, Chief Operating Officer

11/29/2021
_____
(Date)



**I.** <u>**SCOPE OF EMPLOYMENT**</u>. You must comply with all of the following requirements.

A. You must familiarize yourself with and comply with all Requirements.

B. You must price all loans at or above your Minimum Lock Price.

C. You cannot give or receive any compensation on any transaction that is not processed through the Company's payroll and accounting departments.

D. You must ensure and confirm that each loan and related documents and information are processed and conducted only through the Company's approved loan origination system, and approved automated underwriting systems, as applicable.

E. You must, as a condition of your employment, meet all qualifications and standards for loan originator licensure under the SAFE Act and applicable state licensing laws. You must remain current on all continuing education, training, registration and other requirements of licensure, both federally and locally. You must obtain and renew any and all applicable licenses for each state in which you perform and/or intend to perform activity requiring a license. Unless otherwise agreed by the Company, you are expected to obtain any required license or other approval within forty-five (45) days of your hire date. **You are not entitled to compensation for any activity requiring a license, including originating loans, without proper licensure or Temporary Authority.**

F. The Company may grant you Temporary Authority in accordance with state laws and regulations and NMLS requirements to perform licensable loan origination activity, only after all of the following requirements have been satisfied. Until all required tasks and requirements have been satisfied and the Company has notified you of your Temporary Authority approval, you may not conduct any activity requiring a license, which includes but is not limited to: quoting rates or offering mortgage terms to prospective borrowers, discussing eligibility or suitability of particular loan programs, discussing credit qualifications scenarios, issuing pre-approval letters, taking loan applications or otherwise completing 1003s, pulling credit, locking a loan, or marketing or holding yourself out as an individual who can do any of the above. The list of tasks you need to complete before the Company will sponsor your license for Temporary Authority is listed below.

- A complete/submitted application for licensure in NMLS;

- Full explanation and supporting documentation uploads for any "Yes" answer to a disclosure question;

- A criminal history record information check from the FBI;

- Authorization for a credit report to be obtained;

- State-specific documents required as part of ·an MLO license application; and

- License sponsorship by the Company.

After all of the above have been completed, you will be expected to fully complete all additional licensing requirements within **45 days of your application**, which may include, but is not limited to: a passing score on the SAFE Mortgage Loan Originator Test **–** National Component with Uniform State Content, and completion of all required licensing education. In the event these items are not fully satisfied within 45 days, the Company may, at its own discretion, remove sponsorship of the pending license application thereby ending the Temporary Authority status. Should that occur, you will be prohibited from performing any activity requiring a license including those listed above.

You acknowledge and understand that you will not be given Temporary Authority if you have had any of the following occur:

- Had a mortgage loan originator license application denied or a mortgage loan originator license revoked or suspended in any jurisdiction;

- Been subject to or served with a cease and desist order; or

- Been convicted of a misdemeanor or felony that would preclude licensure under the law of the application state.

You acknowledge and understand that if you are not granted Temporary Authority or are not issued a license to conduct business as a mortgage loan originator in one of the jurisdictions in which the Company is licensed to do business, you are not eligible to receive the compensation listed in this Schedule.

G. If you drive a vehicle while conducting business for the Company, you must at all times possess a valid motor vehicle license and must furnish a current copy of such license at any time as requested by the Company. If your driver's license is revoked, suspended or canceled for any reason, you are required to immediately notify the Company of the same.

H. You are responsible for fairly and ethically carrying out your obligations. You may not falsify, alter or modify any document that is part of a mortgage loan transaction. Further, you shall not submit any loan to underwriting if you have reason to believe that the applicant or any other party supplied false or otherwise fraudulent information or documentation. You are required to immediately report this activity to the SARS mailbox, or the Legal or Compliance Departments. You acknowledge and understand that the Company has a zero-tolerance policy for fraud.

I. You may not engage in any acts or omissions that could be considered unfair, deceptive or abusive (i.e., a UDAAP violation) or steer consumers to certain products or programs in order to increase or maximize your personal compensation.

J. You must immediately report to the Company any lawsuit, complaint, regulatory investigation or other similar matter in which you are involved or otherwise relating to the Company that you receive notice about, or any crime you have been convicted of prior to or after the date of your hire, if that crime: (1) involves fraud, theft, embezzlement or another financial services related crime, (2) involves your duties to the Company and/or may impact your ability to perform your job duties, or (3) may affect or threaten your licensing status or standing with any state, agency, or regulatory body. If you are convicted of a crime at any time after receiving your offer of employment from the Company, you must immediately report the same to the Company.

K. You may not engage in any advertising or marketing on your own behalf, or for the Company, unless you have obtained prior written approval from the Company's Marketing Department for the particular advertising or marketing in question. This prohibition includes, but is not limited to posts to social media, mass email mailings, blog posts, personal webpages, and content displayed or transmitted through other electronic media outlets. All marketing and advertising must be approved through the appropriate channels, including review by the Marketing, Legal and Compliance Departments. You also agree that you will not create, directly or indirectly, any webpage, blog or domain that would create

any impression that it is in any way created by, owned by, supported by, or sponsored by the Company, its affiliates, or its parents or subsidiaries. The Company may, however, create Company webpages or other online presences for you as part of its established marketing programs.

L. You agree that you will only communicate with consumers using your Company email address and Company systems for electronic communication. You may not use personal email addresses to conduct Company business.

M. During the term of your employment with the Company, you agree that you will conduct all loan origination activities and otherwise licensable activities only from licensed locations to which you are assigned. You acknowledge that you are not permitted to establish an office or a home office in your residence from which you conduct licensed activities unless permitted by applicable law and approved by the Compliance Department. During the COVID-19 pandemic, the Company has approved work from home in all jurisdictions while the state regulators acknowledge the health risks associated with in person work environments. The Company will inform you when such flexibilities have been terminated by the states or the Company, at which time, you must report to your assigned branch location.

N. You agree to abide by all Company Policies with respect to disclosure, protection, use and storage of consumer data, including any and all non-public consumer financial information. You agree that you will exercise the utmost care in safeguarding the personal data of applicants, borrowers and other consumers and that you will not share, disseminate or utilize that data except in the course of your duties and in accordance with Company Policies. You further agree that you will only transmit or store such data in strict accordance with Company Policies.

O. During your employment with the Company, you may not be employed by any other Person. You also may not become licensed to provide or provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities unless you receive the prior written consent of the Company's Compliance and Human Resources department.

P. You may offer only those loan products and programs that you are approved by the Company and otherwise qualified to offer and made available through an origination channel of the Company.

**Failure to comply with any of these requirements may result in disciplinary action up to and including termination.**

II. <u>OUTSIDE SALES EMPLOYEE</u>

As an Outside Sales Employee, you must regularly and frequently visit with clients and prospective clients, referral partners and potential referral partners in person to discuss the services that the Company offers, explain loan options, procedures, costs/benefits,

DocuSign Envelope ID: 888A90FE-D99C-46B8-85D5-C551FC48C193

etc. These meetings will normally and customarily occur outside of the office. The Company is committed to helping its employees be successful with this platform—if you believe you are not able to, or do not, comply with the duties set forth herein it is your obligation to notify the Company of any such deviation.

## III.  LOAN PRICING.

A. **Loan Pricing.** The Minimum Lock Price at which you must price each loan is set forth in your Schedule.

B. **Pricing above Minimum Lock Price.** To the extent you price any loan above your Minimum Lock Price, you may use a Pricing Surplus to pay for Borrower Expenses. If Borrower Expenses exceed the amount of the Pricing Surplus, the borrower must pay the remaining Borrower Expenses directly. Any Pricing Surplus remaining after paying all Deductible Expenses and any Borrower Expenses may be credited back to the borrower at closing. You may *not* receive any Pricing Surplus at any time, whether in the form of a Commission or otherwise. Moreover, you may *not* offset a Pricing Shortfall on one transaction with some or all of a Pricing Surplus from another transaction.

C. **Pricing Below Minimum Lock Price**. You may *not* price a loan below your Minimum Lock Price unless approved in writing by the Company's Exception Desk. You understand and acknowledge that any such approval will be granted only under limited circumstances that comply with applicable Requirements. If you price a loan below your Minimum Lock Price without written approval from the Company's Exception Desk, the Company may, in its sole discretion, either refuse to close or fund that loan or reassign the loan to a Company-selected loan originator.

## IV.  CALCULATION AND PAYMENT OF COMPENSATION

A. **How We Calculate Your Commissions.** Your Commissions are based on a fixed percentage of the principal amount of each Eligible Loan and, if applicable, Eligible Brokered Loan that you originate and is calculated in the specific manner described in your Schedule and otherwise in accordance with all applicable Company Policies related to the calculation of Commissions.

B. **Timing of Your Commission; Commissions are Advances.** Commissions for each Eligible Loan and Eligible Brokered Loan will be calculated and *advanced* in the pay period following the funding of the Eligible Loan or Eligible Brokered Loan, as applicable, in accordance with the Company's payroll practices. You understand that the Commission on each Eligible Loan and Eligible Brokered Loan is paid as an advance and is not earned until the Company has determined that a Recapture Event (as defined below) has not occurred in connection with the Eligible Loan or Eligible Brokered Loan, as applicable, during the Recapture Period and notice of the same has not occurred during the Recapture Period. The "**Recapture Period**" is the time period that expires one hundred and eighty (180) days after the sale of the Eligible

Loan by the Company on the secondary market or after the date the third party lender funds the Eligible Brokered Loan, as applicable. The Company must receive notice of the Recapture Event during the period beginning on the first day of the Recapture Period and ending on the day that is thirty (30) days after the end of the Recapture Period (the "**Recapture Notice Period**") for the loan to be subject to a Recapture Event. Any notice which comes after the expiration of the Recapture Notice Period does not qualify as a Recapture Event. Upon expiration of the Recapture Period for the applicable Eligible Loan or Eligible Brokered Loan without a Recapture Event, your Commission for that Eligible Loan or Eligible Brokered Loan will be deemed earned ("**Earned Commissions**").

C. **Recapture Events.**

1. Definition. A loan has a "**Recapture Event**" if (i) the Company determines that your compensation is greater than the correct amount owed under the Schedule, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company determines that you committed or knowingly facilitated fraud in originating the loan, (v) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (vi) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed by the Company to a borrower. A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the borrower.

2. Recapture Event Prior to Payment. If a Recapture Event occurs for a loan you originated before the Company has paid you a Commission or other advanced compensation for that loan (collectively, "**Advanced Compensation**"), the Company will not pay you part or all of the Advanced Compensation, as the case may be.

3. Recapture Event After Payment. If the Company has paid you any Advanced Compensation for a loan you originated, and a Recapture Event occurs within the Recapture Period and notice is provided to you within the Recapture Notice Period, you must immediately return all or part of the Advanced Compensation, up to 100% of the Advanced Compensation, as the case may be. If you do not return these amounts, you authorize the Company to recoup these amounts from your future Advanced Compensation or other future compensation and you hereby consent to each such recoupment by the Company.

D. **Review of Monthly Commission Statement.** You agree that within thirty (30) days of the receipt of any Commission statement, you will notify the Company in writing of any objections or disputes regarding such Commission statement, including, without limitation, any errors or omissions in the calculation and payment of any Commission. You understand

DocuSign Envelope ID: 888A90FE-D99C-46B8-85D5-C551FC48C193

and agree that if no such written objection or dispute is received, your silence on the matter will constitute an acknowledgment that the Commission statement is accurate and all Commissions for the relevant time period were properly calculated and paid.

## V.  EFFECT OF TERMINATION

A.  **Commissions Paid After Your Employment Ends**

1.  Termination Other than For Cause. If your employment with the Company ends for any reason other than for Cause, you are eligible to receive Commissions for each Eligible Loan and Eligible Brokered Loan that was originated by you and was funded within thirty (30) calendar days after your last day of employment with the Company. You will not be paid any Commission for any loan that funds more than thirty (30) calendar days after your last day of employment with the Company.

2.  Termination for Cause. If the Company terminates your employment for Cause, the Company will pay to you your then-current accrued and unpaid compensation as of the date of termination. The Company will not pay to you any other Commission for any loan that funds after your termination date.

3.  **Company's Right to Delay Payment after Termination. Notwithstanding anything in this Plan to the contrary, the Company may, in its sole discretion, delay the advance of your unearned Commissions for any loan up to one hundred and twenty (120) calendar days from your last day of employment with the Company. The Company will release any of your held Commissions that have not been subject to a Recapture Event or otherwise subject to deduction for amounts owed one hundred and twenty (120) days after your termination, regardless of whether the full Recapture Period has expired.**

B.  **Bonus After Termination**. Except as may be required by applicable law and except as expressly set forth in the Schedule, if you are eligible to receive any bonus payment: (1) you must be employed by the Company and must otherwise satisfy all applicable conditions to earn and receive such bonus payments and (2) you will not earn or receive any bonus payment that is scheduled to be paid following the end of your employment with the Company.

C.  **Amounts Owed to the Company at Termination.** If at the time of your termination from the Company, you owe the Company any amounts, including, without limitation, any Commissions that were subject to a Recapture Event, or any other amounts, you agree to repay such amounts to the Company within ten (10) calendar days following your termination of employment.  If you do not repay such amounts, the Company reserves the right to deduct such amounts from Commissions and other compensation to be paid to you following termination of your employment and you hereby

expressly consent to such deductions.

## VI.  MISCELLANEOUS.

This Plan, together with any Addenda hereto, is complete and reflects all of the agreements, representations and warranties between you and the Company regarding the subject matter hereof and supersedes all other compensation schedules, plans and agreements (oral or written) in effect prior to the execution of this Plan (but not your Employment Terms).  To the extent that any term of this Plan conflicts with any applicable federal, state or local law, the Company shall follow applicable law instead of any conflicting term of this Plan.  Your compensation will be paid in the manner described above according to the applicable payroll practices of the Company, which may change from time to time, and will be subject to all applicable withholdings.  If a court, mediator, or arbitration tribunal determines that any provision contained in this Plan is unenforceable in any respect, then the effect of such provision shall be limited and restricted so as to permit the provision to be enforceable or, if that is not possible, such provision will be removed from this Plan, but in either case, this Plan shall remain in full force and effect to the extent permitted and should be interpreted, even if modified, to achieve the full intent expressed.  The Company reserves the right to change, amend or supplement this Plan and the amounts, structure and/or terms of your compensation or the manner in which such compensation is calculated at any time with prior notice to you.  The Company reserves the right to terminate this Plan at any time.  You acknowledge and agree that the Company, through its Chief Executive Officer, Chief Operating Officer, Chief Revenue and Strategy Officer or other designated officer shall have the complete authority and discretion to interpret this Plan and the calculation and payment of any compensation and resolve any disputes regarding interpretation of this Plan. Any such decisions shall be final and binding upon the Parties.  The Parties acknowledge and agree this Plan may be executed in counterparts and by PDF, electronic or digital signature, and any contract formation or record-keeping through electronic means shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based recordkeeping system to the fullest extent permitted by applicable law.  This Plan will be effective only after it has been fully executed by you and an officer authorized by the Company.

## VII.  DEFINITIONS

Capitalized terms that are not otherwise defined in the Plan shall have the meaning set forth below.

**"Advanced Compensation"** has the meaning set forth in Section IV(C)(2) of these Compensation Terms.

**"Basis Point"** means a unit of measure equal to one hundredth of one percent.  One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

**"Borrower Expenses"** mean all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

DocuSign Envelope ID: 888A90FE-D99C-46B8-85D5-C551FC48C193

"**Cause**" means: (a) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (b) you violate Company Policies, (c) you fail to comply with the terms of your contractual obligations to the Company, (d) you fail to perform duties reasonably requested by the Company, (e) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, or (f) you take an action or fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry.

"**Commission**" means the amount of your variable compensation earned from your loan origination activities and identified as commissions in the Schedule.

"**Company**" means Guaranteed Rate, Inc.

"**Company Policies**" all Company policies, procedures, guidelines, and directives, including, without limitation, those set forth in the Company's Employee Handbook, which policies, procedures, guidelines, and directives the Company, in its sole discretion, may amend from time to time with or without notice.

"**Compensation Terms**" means these Vice President of Mortgage Lending Compensation Plan Terms and Conditions.

"**Deductible Expenses**" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, *other than* the amount of your Commission and any Borrower Expenses credited back to the borrower by the Company.

"**Early Payment Default**" means a loan that defaults during an "Early Payment Default Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan or the broker agreement with the lender that closed and funded the loan.

"**Early Payoff**" means a loan that pays off in whole or in part during an "Early Prepayment Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan or the broker agreement with the lender that closed and funded the loan.

"**Earned Commission**" has the meaning set forth in Section IV(B) of these Compensation Terms.

"**Eligible Brokered Loan**" means each first-lien closed-end mortgage loan that (a) is originated by you (b) is brokered by the Company to another lender, (c) is closed and funded by the third-party lender, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"**Eligible Loan**" means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor at a price that complies with all Requirements in this Plan and is not the subject of a valid repurchase demand, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"**Minimum Lock Price**" means the price at which you agree to lock each loan you originate, as set forth in the Schedule.

"**Net Loan Revenue**" means the net revenue received by the Company in connection with the funding and sale of an Eligible Loan, after subtracting all Deductible Expenses and any Borrower Expenses credited back to the borrower.

"**Outside Sales Employee**" means an outside sales employee, as defined in Section 13(a)(1) of the Fair Labor Standards Act and applicable state law, who is exempt from both minimum wage and overtime pay requirements under the Fair Labor Standards Act and applicable state law.

"**Person**" means any natural person, corporation, limited liability, partnership, sole proprietorship or any other entity.

"**Plan**" means this Vice President of Mortgage Lending Compensation Plan, collectively comprised of the then-current Schedule and Compensation Terms, and any addenda thereto.

"**Pricing Shortfall**" means the Net Loan Revenue shortfall arising from pricing any Eligible Loan you originate below your Minimum Lock Price.

"**Pricing Surplus**" means the Net Loan Revenue surplus arising from pricing any Eligible Loan you originate above your Minimum Lock Price.

"**Recapture Event**" has the meaning set forth in Section IV(C)(1) of these Compensation Terms.

"**Recapture Notice Period**" has the meaning set forth in Section IV(B) of these Compensation Terms.

"**Recapture Period**" has the meaning set forth in Section IV(B) of these Compensation Terms.

"**Requirements**" means: (a) all Company Policies; (b) all applicable laws, rules, regulations, and orders; (c) all applicable agreements with third parties, including, without limitation, warehouse, investor and agency policies, procedures, guidelines and other requirements; (d) all terms, conditions and obligations in this Plan, and (e) all terms, conditions and obligations contained in any other agreements you may enter into with the Company.

"**Schedule**" means the then-current Vice President of Mortgage Lending Compensation Schedule to this Plan.

### Out of State Referral Acknowledgement

As a licensed loan officer, you are obligated to ensure that you are complying with the SAFE Act to protect your license and the Company's licenses. The Company has designed a compliant method for a loan originator to refer a loan to a licensed individual in states in which he or she may not be licensed. Under the program, when an unlicensed individual receives an unsolicited lead in a state in which he or she is not licensed, the referral is to be sent to the DLO Desk. Below you will find a non-exhaustive list of what you may or may not do as the Process Manager:

The Process Manager may:

- Generally, describe for a borrower the loan process from a high level/educational perspective (i.e. definition of a mortgage, LE, etc.)
- Provide general explanations or descriptions in response to consumer inquiries (but nothing specifically related to the consumer's situation)
- Help in arranging the loan closing or other aspects of the loan process, provided that any communication that includes a discussion about loan terms only verifies terms already agreed to by the borrower and the DLO

The Process Manager **MAY NOT** (ONLY the licensed loan originator may engage in these activities):

- Discuss particular loan programs, rates, credit qualification scenarios, etc. (e.g. state, "The best product for you would be a 7/1 ARM," "I think I could lock your rate at 4.65%," "I don't think you qualify for that bond program," etc.)
- Issue pre-approval letters, even if in the name of the licensed individual
- Complete, or assist directly or indirectly in taking, an applicant's 1003
- Run credit or lock the loan
- Discuss credit scores needed to qualify or other financial information related to a borrower's ability to qualify
- Discuss loan options or present a loan summary
- Solicit loan applications in states in which you're not licensed

By signing below, you acknowledge that if the Company determines you have engaged in inappropriate activity requiring a license, it may revoke your ability to refer loans in the future, or take other disciplinary action, up to and including termination as it deems appropriate. Furthermore, you will not be eligible to receive compensation for any referred transaction when inappropriate activity requiring a license is identified. Lastly, your signature below confirms your complete understanding of the requirements around the SAFE Act and what constitutes activity requiring a license.

Signed: _David Ashman_
DocuSigned by:
6614ED9C00C24AD...

Date: 11/28/2021



## TERMS AND CONDITIONS OF EMPLOYMENT

## (ATLANTIC HOME LOANS RETAIL TRANSITION)

This Terms and Conditions of Employment Agreement (the "**Agreement**") is entered into in connection with the commencement or the continuation of the undersigned employee's employment with Guaranteed Rate, Inc.("**GRI**") and any of its Affiliates (collectively, the "**Company**"). For these purposes, an "**Affiliate**" means any entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, GRI. The undersigned employee is referenced herein as "you" or "your." You and the Company are referenced herein together as the "**Parties**" and each individually, as a "**Party.**"

1. **Employment Obligations**. You agree to this Agreement in exchange for the Company's offer to employ or, as applicable, continuing to employ, you and for any other good and valuable consideration provided, the sufficiency of which you hereby acknowledge. This Agreement shall be in effect at all times during the term of your employment at the Company with certain covenants, as detailed herein, surviving termination of your employment. This Agreement clarifies certain rights and duties of the Company and you. You hereby accept such employment and agree with the Company that: (a) you will perform all of your employment obligations in a manner that is ethical, fair and honest; (b) you will devote your working time and attention, as well as your best efforts and abilities, to the performance of your duties hereunder and to the affairs of the Company and shall not engage in any other gainful employment without the prior written consent of the Company; (c) you will not engage in any other activities that interfere with the proper discharge of your duties to the Company; (d) you will exercise the utmost care in safeguarding non-public personal information of applicants, borrowers, customers and employees; and (e) you will comply with all applicable Requirements. For purposes of this Agreement, "**Requirements**" means: (i) all Company policies, procedures, guidelines, and directives, including, without limitation, those set forth in the Company's Employee Handbook, which policies, procedures, guidelines, and directives the Company, in its sole discretion, may amend from time to time with or without notice (collectively, the "**Company Policies**"); (ii) all applicable laws, rules, regulations, and orders; (iii) all applicable agreements with third parties, including, without limitation, warehouse, investor and agency policies, procedures, guidelines and other requirements; (iv) all terms, conditions and obligations in this Agreement, and (v) all terms, conditions and obligations contained in any compensation schedule or plan or other agreements or arrangements you may enter into with the Company ("**Other Arrangements**").

2. **Compensation Matters**. Your compensation will be determined in accordance with the Company Policies and any applicable Other Arrangement and will be paid pursuant to the Company's applicable payroll schedule and practices and subject to all applicable withholdings. You may also participate in the Company's employee benefits plans and programs (which may change from time to time) provided you enroll and meet all eligibility requirements.

3. **Termination of Employment**.

(a) "At Will" Employment. Your employment with the Company is "AT-WILL." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. Nothing contained in this Agreement or any Other Arrangements shall be interpreted to alter or otherwise modify your status as an "at-will" employee or create any obligation or right to employment for a specific term or duration.

(b) Obligations upon Termination. Upon your termination of employment with the Company for any reason, or at any other time requested by the Company, you must immediately return to the Company all Company property (whether in hard-copy or electronic form) such as equipment, materials, data, files, and any other information, including, without limitation, all Confidential Information (as defined below) and copies thereof, in your possession. You may not retain any Confidential Information, or tangible or intangible (electronic) copies of any Confidential Information after your termination of employment for any reason. If requested by the Company, you shall disclose to the Company any passwords for your Company-issued computer or other access codes for anything associated with your employment with the Company, and shall not delete or modify or alter any property prior to its return to the Company. If requested by the Company, you also shall provide the Company with access to any personal computer, tablet, phone, external hard drives, flash drives, cloud-based storage platforms, or any other personal device or storage location that contains Company information, whether or not such information is designated as confidential or proprietary, so that the Company may review, collect, remove or delete any Company information.

(c) Bonus After Termination. Except as may be required by applicable law or as expressly set forth in an Other Arrangement, if you are eligible for any bonus payment: (i) you must be employed by the Company and must otherwise satisfy all applicable conditions to earn and receive such bonus payments and (ii) you will not earn or receive any bonus payment which comes due following the end of your employment with the Company.

4. **Confidentiality and Non-Solicitation.** You must notify any prospective employer about your obligations in this Section 4 and that such prospective employer may obtain a copy of these obligations from the Company's Human Resources or Legal Department.



(a) <u>Confidentiality</u>.

(i) <u>Definition of Confidential Information</u>. During the course of your employment with the Company, you will learn about, help to develop, and will be entrusted in strict confidence with (A) confidential and proprietary information and trade secrets concerning the Company that are or will be owned by the Company and are not available to the general public or to the Company's competitors, including, without limitation, information about sales, operations, technology, marketing ,financial condition, financial projections, profit margins, the identity of the Company's top-performing employees, hiring criteria, training techniques, business goals, strategic plans, promotional strategies, pricing and cost structure of services, customer or potential customer identities and information, customer relationship histories, customer records, customer service matters, customer preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, plans, specifications, manuals, forms, templates, software programs, source code, object code, research and development, methods, procedures, formulas, discoveries, inventions, improvements, intellectual property, innovations, concepts and ideas, and product and/or service specifications, features, advantages, disadvantages and/or limitations, and other confidential aspects of the Company and its businesses and operations; (B) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations with third parties; and (C) other matters, documents, materials and information belonging or relating to the internal affairs of the Company (collectively, "**Confidential Information**"). The Company has expended great time, expense and effort in obtaining and protecting the confidentiality of this Confidential Information and has a legitimate, protectable interest in the Confidential Information, including, without limitation, customer identities, customer preferences and other customer information.

(ii) <u>Use of Confidential Information</u>. In consideration of your employment and compensation and other consideration described herein, you acknowledge and agree that: (A) as between you and the Company, the Confidential Information is, and at all times hereafter shall remain, the sole property of the Company; (B) you shall use your best efforts and the utmost diligence to guard and protect the Confidential Information from disclosure to any other person or entity, including, without limitation, any competitor, client or supplier of the Company; and (C) unless an officer of the Company gives you prior express written consent, during your employment and thereafter to the maximum extent permitted by applicable law, you shall not use for your own benefit, or disclose to or use for the benefit of any other person or entity, including, without limitation, any competitor, customer, vendor, supplier or referral partner any of the Confidential Information which you may obtain, learn about, develop, or be entrusted with as a result of your employment with the Company. In addition, you may not seek or accept any third-party confidential information from any person or entity, except in connection with your employment duties and obligations under this Agreement.

(iii) <u>Customer Contacts</u>. Confidential Information includes the identities and contact information of customers that you learned of or worked with while an employee of the Company. However, if you are a licensed retail loan originator, in accordance with Company Policies, you may contact and/or solicit customers for whom you originated a loan while an employee of the Company during and after your employment with the Company ends, provided that, no such customer (A) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for your actions or omissions, (B) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your actions or omissions, or (C) has closed a loan with the Company and the Early Prepayment Period (as defined in the Company's loan purchase and sale agreement with the investor that purchased or insured the loan) has not yet expired.

(iv) <u>Defend Trade Secrets Act</u>. As required by the Defend Trade Secrets Act, the Company hereby notifies you that misappropriation or improper disclosure of Company trade secret or confidential information is protected by law if the disclosure is made in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law, or is made in a complaint or other document filed in a lawsuit or other proceeding, or in an anti-retaliation lawsuit, if the filing is made under seal, and there is no disclosure of trade secret information except pursuant to court order. This immunity applies to trade secret law violations of any state or federal law and in both civil and criminal contexts.

(b) <u>Non-Solicitation</u>. In this Agreement, "**Restricted Period**" means the period beginning with the first day of your employment with the Company and ending twenty-four (24) months after any voluntary or involuntary termination of your employment. The Restricted Period shall be extended by one month for each month or portion of each month during which you are in violation of this Section 4(b).

(i) <u>Employees</u>**.** The Company devotes considerable resources to recruiting, retaining and training its employees, and the stability of the Company's workforce is critical to its ongoing success. The Company takes significant steps to protect the relationships it has with its employees. During the Restricted Period, to the maximum extent permitted by applicable law, you may not, directly or indirectly (i.e., working through others), hire, solicit, or encourage any person employed by the Company and with whom you had business contact during your last twelve (12) months of employment with the Company or during the remainder of the Restricted Period to end their employment with the Company and/or join you as a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship. You may ask the Company to provide you with written

V090821

DocuSign Envelope ID: 888A90FE-D99C-46B8-85D5-C551FC48C193



consent to engage in any of the foregoing activities. The Company may approve or deny any such request in the Company's sole discretion. **If you fail to comply with any provision of this Section 4(b)(i), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to $50,000 for each such instance of non-compliance because the calculation of actual damages to the Company from any improper solicitation may be difficult to ascertain**. Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company. You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section 4(b)(i), and is not a penalty.

(ii) <u>Customers, Vendors, Suppliers, or Referral Partners</u>. During the Restricted Period, to the maximum extent permitted by applicable law, you will not, for yourself or on behalf of any other person or entity, directly or indirectly (i.e., working through others), call on, solicit or service any (A) customer, (B) vendor, (C) supplier or (D) referral partner of the Company that you worked with, learned of, or otherwise had contact with during the twelve (12) month period prior to the termination of your employment in order to induce or attempt to induce such person or entity to cease doing business with the Company, reduce its business with the Company, or in any other way interfere with the relationship between the Company and that person or entity; provided that, nothing in this Section 4(b)(ii) is intended to limit your rights pursuant to Section 4(a)(iii) if you are a licensed retail loan originator.

(c) <u>Enforcement; Remedies.</u> You covenant, agree and recognize that because the breach or threatened breach of any of the covenants contained in this Section 4 will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants contained in this Section 4 to the fullest extent allowed by law. Nothing herein shall be construed as prohibiting the Company from pursuing all equitable remedies that may be available to them for any such breach.

(d) <u>Construction</u>. You hereby expressly acknowledge and agree as follows: (i) the covenants set forth in this Section 4 are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and (ii) each of the covenants set forth in this Section 4 is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

5. **Representations, Warranties and Indemnity**

(a) <u>Representations and Warranties</u>. You represent and warrant to the Company that neither you nor anyone acting on your behalf has, without prior authorization: (i) taken, accepted, copied, or misappropriated any confidential, proprietary, or trade secret documents, data, or information acquired from any former employer or other party; (ii) transmitted, communicated or divulged any confidential, proprietary or trade secret information from any former employer or other party to the Company or its employees; (iii) used any confidential, proprietary or trade secret information of any former employer or other party in connection with your employment with the Company; or (iv) violated any post-employment restrictive covenants or obligations owed to any former employer (including without limitation any non-competition, non-solicitation, or confidentiality agreements). You further represent, warrant and covenant that you will not engage in any of the foregoing conduct during the course of your employment with the Company because the Company does not want you to breach any obligations you may have to any former employer or other party. You also understand that the Company may discipline you, up to and including termination of employment, in the event you breach any such obligations. By signing below, you represent and warrant that your prospective or current employment with the Company does not violate any non-compete or other obligations that you may have with or owe to any of your former employer(s). Notwithstanding the foregoing, nothing in this Section 5 is intended to prohibit or limit authorized activities in connection with your transition from Atlantic Home Loans, Inc. ("**AHL**") to the Company.

(b) <u>Indemnity</u>. During your employment with the Company and thereafter, you shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Section 5.

6. **Intellectual Property Ownership**

7. **Assignment. You hereby acknowledge and agree that the Employing Company (as defined below) owns the sole and exclusive right, title and interest in and to any and all Company Works (as defined below), including, without limitation, all copyrights, trademarks, service marks, trade names, slogans, inventions (whether patentable or not), patents, trade secrets and other intellectual property and/or proprietary rights therein in all countries and territories worldwide and under any international conventions, including, without limitation, all rights to sue for infringement thereof (collectively, "IP Rights"). The**

V090821



Employing Company's right, title and interest in and to the Company Works includes, without limitation, the sole and exclusive right to secure and own copyrights and maintain renewals throughout the world, the right to modify and create derivative works of or from the Company Works without any payment of any kind to you, and the right to exclusively register or record any IP Rights in the Company Works in the Employing Company's name. You agree that all Company Works shall be "works made for hire" for the Employing Company as that term is defined in the copyright laws of the United States or other applicable laws. To the extent that any of the Company Works is determined not to constitute a work made for hire, or if any rights in any of the Company Works do not accrue to the Employing Company as a work made for hire, you hereby assign and transfer to the Employing Company all of your rights, title and interest in and to any and all Company Works and all related IP Rights. You will promptly disclose all Company Works to the Employing Company. You further waive, to the extent permitted by applicable law, all "moral rights" you have in and to the Company Works. During your employment with the Employing Company and afterward, you may be required to sign additional documents and agreements related to the Employing Company's ownership and registration of IP Rights and you hereby agree to execute such other agreements without additional consideration. If the Employing Company is unable for any reason whatsoever, including the Employing Company's inability after expending reasonable efforts to locate you or your mental or physical incapacity, to secure your signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations or other intellectual property rights (or on any document transferring ownership thereof) covering IP Rights assigned to the Employing Company under this Agreement, you hereby irrevocably designate and appoint the Employing Company (and any successor or assign) and its duly authorized officers and agents as your agent and attorney-in-fact to act for and on your behalf and in your stead to execute and file any such applications and documents and to do all other lawfully permitted acts to further the prosecution and issuance of patents or copyright registrations or transfers thereof with the same legal force and effect as if executed by you. This appointment is coupled with an interest in and to the Company Works and related IP Rights and shall survive your death or disability. The term "Employing Company" means the entity employing you at the time that the applicable Company Work is conceived, created, developed, discovered, made or acquired, in whole or in part.

8. <u>Works and Company Works</u>. "Works" means any inventions, invention disclosures, developments, discoveries, improvements, modifications, trade secrets, brands, logos, designs, drawings, trademarks, service marks, trade names, documents, memoranda, data, databases, software programs, object code, source code, algorithms, ideas, know-how, methods, processes, graphics, images, audio and/or visual works, other works of authorship, or other intellectual property or information, including works-in progress. "Company Works" means any Works that you conceive, create, develop, discover, reduce to practice, make or acquire, in whole or in part, either solely or jointly with another or others, at any time during or pursuant to the course of your employment by the Company, and that relate directly or indirectly to the Company or its respective businesses, or to the Company's actual or demonstrably anticipated research or development, or that are made through the use of any of the Company's equipment, facilities, supplies, trade secrets or time, or that result from any work performed for the Company, or that is based on any information of, or provided to you by, the Company. All Company Works and related IP Rights shall be deemed the Confidential Information of the Company.

9. <u>Prior Works</u>. You agree not to incorporate, or permit to be incorporated, any Prior Works into any product, process, program, machine or other work done for the Company, including any software code created or developed on the Company's behalf or in which the Company has an ownership interest pursuant to the terms of this Agreement, without the Company's prior written consent. Notwithstanding the foregoing, if you incorporate a Prior Work into any Company Work or any Company product, process, program, machine or other work done for the Company (whether or not such Prior Work was disclosed and whether or not you had the written consent of the Company to do so), you hereby grant to the Company a nonexclusive, paid-up, royalty-free, irrevocable, perpetual, transferable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, copy, modify, use, sell, offer to sell, display, distribute and import such Prior Work. "Prior Works" means all Works that were made by you prior to your employment with the Company, you own or in which you have an interest, and which relate to the Company's current or proposed business, products, services, or research and development, and are not presently assigned by you to the Employing Company under this Agreement or otherwise.

10. <u>Notice of Statutory Exception</u>. You hereby are and have been notified by the Company that Company Works shall not include any invention that you develop entirely on your own time without using any equipment, supplies, facilities, or trade secret information of the Company unless (i) the invention: (A) relates at the time of conception or reduction to practice of the invention to the business of the Company or (B) to the Company's actual or demonstrably anticipated research or development; or (ii) the invention results from any work performed by you for the Company.

11. <u>Limits of Authority.</u> You are not authorized to: (a) originate any loan or engage in any licensed activity unless done so in your capacity as a licensed loan originator in accordance with all applicable Requirements, (b) underwrite or approve any loan, unless you are employed by the Company as an underwriter or underwriting manager; (c) bind the Company under any agreement, lease, commitment or other obligation unless approved by an authorized representative of the Company in writing; or (d) incur expenses on behalf of the

V090821

DocuSign Envelope ID: 888A90FE-D99C-46B8-85D5-C551FC48C193



Company, except insofar as such expense has been expressly approved in writing by an authorized representative of the Company.

**12.** **ARBITRATION AND WAIVER OF RIGHT TO SUE AND RIGHT TO FILE ANY CLASS OR COLLECTIVE ACTION.** By accepting employment or continuing employment with the Company, as applicable, the Parties agree to arbitration as set forth in the separate arbitration agreement and waiver of the right to sue and to bring any class or collective action (the "**Arbitration Agreement**") provided concurrently herewith and incorporated herein by reference; provided that, in the event that for any reason the Arbitration Agreement is deemed not enforceable, any previously executed agreements between the Parties relating to the arbitration of disputes and waiver of the right to sue and to bring a class or collective action shall remain in full force and effect to the maximum extent permitted by applicable law.

**13.** **Venue.** To the extent any claim or action is not subject to arbitration in accordance with the Arbitration Agreement, you irrevocably consent to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois, for the purposes of any claim or action relating to or arising out of this Agreement and/or your employment with or termination from the Company.

**14.** **Attorney's Fees and Injunctive Relief.** To the extent permitted by applicable law, the prevailing Party in any dispute arising out of your employment with the Company or any termination thereof shall be entitled to recover all reasonable attorney's fees, expenses and costs incurred in any action or proceeding to pursue or defend such dispute. Because money damages for the breach or threatened breach of any obligations under this Agreement may be inadequate to properly compensate for losses resulting from a breach of this Agreement, either Party may seek injunctive relief, specific performance or other remedies in equity for such a breach or threatened breach, without first being obligated to post any bond or show actual damages.

**15.** **Miscellaneous.**

**16.** **Complete Agreement.** **Except as may be set forth in the Other Arrangements, this Agreement is complete and reflects all of the agreements, representations and warranties between you and the Company regarding the subject matter hereof and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement with respect to the same subject matter; provided that, any provisions in any previous agreements with the Company and AHL relating to confidentiality and restrictive covenants (including, without limitation, any non-solicitation obligations with respect to employees, customers, vendors, suppliers or referral partners) shall remain in full force and effect to the maximum extent permitted by applicable law. The Company, in its sole discretion, may amend this Agreement with prior written notice to you and execution of a written amendment by you and the Company. Notwithstanding the foregoing, the Company may unilaterally amend this Agreement at any time with prior notice to comply with any applicable law, rule, regulation or other requirement or to make any amendments that are generally applicable to all similarly situated employees (which amendments shall be effective immediately upon notice to you).**

**17.** **Severability and Reformation.** **Should any one or more of the parts or subparts of a provision contained in this Agreement, for any reason, be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other part or subpart of a provision of this Agreement or any other jurisdiction, but the Parties agree that a court or arbitrator, as applicable, shall reform and construe this Agreement as if such invalid, illegal or unenforceable part or subpart of a provision had never been contained in this Agreement, and a court or arbitrator shall reform such part or subpart so that it would be valid, legal and enforceable to the maximum extent permitted in such jurisdiction. Without limiting the foregoing, the Parties intend that the parts and subparts in this Agreement shall be deemed a series of separate covenants and agreements. If, in any legal proceeding, a court or arbitrator shall refuse to enforce all the parts and subparts, it is the intention of the Parties that the remaining non-eliminated separate parts and subparts be enforced in such a proceeding.**

**18.** **Waiver.** **No delay on the part of any Party in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise or waiver thereof by any Party of any right or remedy shall preclude the exercise or further exercise thereof or the exercise of any other right or remedy. No waiver is enforceable against the Company unless it is in writing signed by the Company .**

**19.** **Assignment.** **You may not assign this Agreement or any rights under this Agreement or the Arbitration Agreement. The Company freely may assign its rights under this Agreement or the Arbitration Agreement, including without limitation, to any Affiliate or to any successor in interest, whether by merger, consolidation, sale of assets, or otherwise. This Agreement shall be binding whether between you and the Company or between you and any Affiliate, successor or assign of the Company.**

**20.** **Right to Consult an Attorney; No Duress:** **You acknowledge that you may consult with your own attorney for advice concerning this Agreement. You further acknowledge that this Agreement is entered into voluntarily and that your signature was not coerced or made under duress. By accepting or continuing employment with the Company, you acknowledge and agree that you will be deemed to have assented to the terms of this Agreement.**

V090821

DocuSign Envelope ID: 888A90FE-D99C-46B8-85D5-C551FC48C193



**21. Counterparts; Electronic Signatures**:  The Parties acknowledge and agree that this Agreement may be executed in counterparts and by PDF, electronic or digital signature hereto, and any contract formation or record-keeping through electronic means shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based recordkeeping system to the fullest extent permitted by applicable law, and the Parties hereby waive any objection to the contrary.

V090821



**BY SIGNING BELOW, YOU HEREBY ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT AND HAVE HAD A SUFFICIENT OPPORTUNITY TO READ AND REVIEW IT. YOU UNDERSTAND THAT THIS AGREEMENT SETS FORTH CERTAIN TERMS, CONDITIONS AND OBLIGATIONS OF YOUR EMPLOYMENT WITH THE COMPANY. YOU FURTHER ACKNOWLEDGE AND UNDERSTAND THAT THIS AGREEMENT CONTAINS CERTAIN WAIVERS OF RIGHTS, AND THAT YOUR WAIVERS OF SUCH RIGHTS ARE ENTERED KNOWINGLY AND VOLUNTARILY. YOU AGREE TO COMPLY WITH AND TO BE BOUND BY THIS AGREEMENT.**

David Ashman

(Print your name here)

*David Ashman*

0014ED9C09C24AD...

(Place your signature here)

GUARANTEED RATE, INC.

EB80CD55871A479...

By: Nikolaos Athanasiou

Title: Chief Operating Officer

11/28/2021

Date

11/29/2021

Date

V090821

DocuSign Envelope ID: 888A90FE-D99C-46B8-85D5-C551FC48C193



## VOLUNTARY MUTUAL AGREEMENT TO ARBITRATE CLAIMS

This Voluntary Mutual Agreement to Arbitrate Claims ("**Agreement**") is agreed to in connection with the application for, commencement of or continuation of the undersigned's employment with Guaranteed Rate, Inc. ("**GRI**") and any of its Affiliates (collectively, the "**Company**"). For these purposes, an "**Affiliate**" means any entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, GRI and the "Company" includes all employees, officers, directors, shareholders, agents, benefit plans, subsidiaries and related entities of the Company (past, present, or which may be formed in the future). This Agreement refers to the undersigned as "you" or "your". This Agreement also refers to you and the Company together as the "**Parties**" and each individually, as a "**Party**."

1.  **All Disputes are Subject to Binding Arbitration Under the FAA:** The Parties hereby mutually agree that each of them will utilize binding arbitration under the Federal Arbitration Act ("**FAA**") as the sole and exclusive means to resolve all claims (legal or equitable), disputes or controversies arising out of, relating to, or resulting from employment with the Company or the termination of employment with the Company, except as provided below. Each Party specifically waives and relinquishes its respective rights to bring a claim against the other in a court of law, except as provided below, and this waiver will be equally binding on any person who represents or seeks to represent you or the Company in a lawsuit against the other in a court of law. Except as provided below, both of the Parties agree that any claim, dispute or controversy that you may have against the Company, or the Company may have against you, will be submitted to and determined exclusively by binding arbitration under the FAA, including, but not limited, to questions regarding the scope of arbitration or the jurisdiction of the arbitrator.

2.  **Application of FAA; Exceptions to Arbitration**: You and the Company agree the FAA applies to this Agreement. You and the Company also agree the scope of this Agreement includes all disputes, whether based on tort, contract, or statute. This includes any claims of discrimination, harassment and/or retaliation, whether they be based on Title VII of the Civil Rights Act of 1964, as amended, or any other state or federal law or regulation, equitable law, or otherwise. However, this Agreement does not cover the following: (a) claims arising under the National Labor Relations Act brought before the National Labor Relations Board; (b) claims for workers' compensation (although claims for retaliation are covered by this Agreement); (c) claims for unemployment or other benefits under a plan or collective bargaining agreement that provides its own process for dispute resolution; (d) claims by either Party seeking only a provisional remedy in any court of competent jurisdiction; (e) claims for which this Agreement would be invalid as a matter of federal law, or state or local law that is not preempted by federal law; (f) actions to enforce this Agreement, compel arbitration, or enforce, modify, or vacate an arbitrator's award; or (g) a claim or charge filed with a federal, state, or local administrative agency such as the United States Equal Employment Opportunity Commission, National Labor Relations Board, or similar agency, although you do knowingly and voluntarily waive the right to file, or participate or obtain relief in, a lawsuit of any nature against the Company, except as described herein. However, if you pursue a claim or charge following the exhaustion of such administrative remedies, that claim would be subject to this Agreement. *By this binding arbitration provision, the Parties gives up their respective rights to trial by jury of any claim one Party may have against the other Party that may arise out of or be related to your employment or termination of your employment, except as stated herein*.

3.  **Individual Capacity:** You and the Company will bring all claims brought under this Agreement in an individual capacity.

4.  **Waiver of Right to Bring Class or Collective Claim:** This Agreement will not be construed to allow or permit the consolidation or joinder of other claims or controversies involving any other employees, or permit such claims or controversies to proceed as a class, collective or representative action. By signing this Agreement, you are agreeing to waive any substantive or procedural rights you may have to sue on a class, collective or representative basis. No court or arbitrator will have the authority under this Agreement to order a class, collective, or representative action to proceed in arbitration.

5.  **Waiver of Right to Bring Action as a Private Attorney General:** This Agreement will not be construed to allow or permit claims brought on behalf of any state or government as a private attorney general to the maximum extent permitted by applicable law. By signing this Agreement, you are agreeing to waive any substantive or procedural rights you may have to sue on as a private attorney general to the maximum extent permitted by applicable law. No court or arbitrator will have the authority under this Agreement to order claims brought on behalf of any state or government as a private attorney general to proceed in arbitration.

6.  **Disputes Concerning Class or Collective Action Waiver**: The Parties agree that a court of competent jurisdiction will be the sole determiner of any disputes regarding whether this Agreement allows for class, collective or representative arbitration. A court of competent jurisdiction will decide all issues concerning the enforceability of the class, collective, or representative waivers herein. The Parties agree and hereby stipulate that an arbitrator has no authority or jurisdiction regarding these issues.

V090821



7.   **Determinations Concerning Application of FAA and Validity of Class and Collective Action Waivers**:  You and the Company agree that a court of competent jurisdiction will be the sole determiner of whether the FAA applies to this Agreement and whether the class, collective and representative action waivers contained in this Agreement are valid and enforceable.

8.   **Invalidity of Class or Collective Action Waiver**:  If a court determines that the prohibition on class, collective, private attorney general, or representative actions is invalid or unenforceable, you and the Company waive any right to arbitration of the class, collective, private attorney general, or representative actions. Instead, you and the Company agree that such claims will proceed in court and not before an arbitrator, but only after you and the Company arbitrate any claims subject to this Agreement.

9.   **Collective Bargaining:**  This Agreement is not intended to interfere with your rights to collectively bargain, to engage in protected, concerted activity, or to exercise other rights protected under the National Labor Relations Act, and you will not be subject to disciplinary action of any kind for opposing the arbitration provisions of this Agreement.

10.   **Initiating a Claim:** A Party wishing to initiate arbitration must notify the other Party in writing by hand delivery, registered or certified mail, or physical delivery by a recognized courier service. The notice should identify the party requesting arbitration by name, address, and telephone number; the facts upon which the claim is based, the persons involved, the date and location of any occurrences giving rise to the claim, the law(s) allegedly violated; and the remedy requested. Notice to the Company must be sent to:  Guaranteed Rate, Inc., Attention Legal Department, 3940 N. Ravenswood, Chicago, Illinois 60613. The notice must include the following language capitalized and bolded: "**ARBITRATION DEMAND, ATTENTION LEGAL DEPARTMENT.**" Notice to you must be sent to your most recent residence address in the Company's records.

11.   **Arbitrator Selection/Conduct of Proceedings and Hearing**:  The Parties agree to use the American Arbitration Association for arbitration.  An arbitrator shall be selected in accordance with the then-current American Arbitration Association's Employment Arbitration Rules.  The rules may be found at www.adr.org or by using an internet search engine (such as google.com or bing.com).  Upon selection, the arbitrator shall determine an appropriate date, time, and place for the arbitration hearing, after conferring with the Parties. All federal rules of pleading (including the right to file a Motion to Dismiss), all federal rules of evidence, all rights to resolution of the dispute by means of motions for summary judgment, judgment on the pleadings, directed judgment or non-suit, and Federal Rule of Civil Procedure 68 ("Offer of Judgment") shall apply and be observed; however, if any such rules conflict with the terms of this Agreement, this Agreement will control. The arbitrator will have the immunity of a judicial officer from civil liability when acting in the capacity of an arbitrator, which immunity supplements any other existing immunity.  As reasonably required to allow full use and benefit of this Agreement, the arbitrator shall extend the times set for the giving of notices and setting of hearings. Awards will include the arbitrator's written reasoned opinion. Except as otherwise provided herein, the arbitrator shall apply, and shall not deviate from, the substantive law of the state in which the claim(s) arose and/or federal law, as applicable. Resolution of all disputes shall be based solely upon the law governing the claims and defenses pleaded, and the arbitrator may not invoke any basis (including but not limited to, notions of "just cause") other than such controlling law.

12.   **Location of the Arbitration**:  The arbitration hearing(s) for all claims brought under this Agreement shall be held in the federal judicial district where you applied for employment or work or worked for the Company, unless the Parties agree otherwise.

13.   **Costs of Arbitration and Attorney's Fees**:  The Company will pay all costs unique to arbitration, including the arbitration fees and expenses. However, if you are the Party initiating the claim, you shall be responsible for contributing an amount equal to the filing fee to initiate the claim in your home state, unless the arbitrator determines such fee should be waived due to a showing of reasonable need. Except as provided in Federal Rule of Civil Procedure 68 or as determined by the arbitrator in accordance with applicable legal standards, each Party shall pay its own attorneys' fees and any costs that are not unique to the arbitration. Any dispute as to whether a cost is unique to arbitration shall be resolved by the arbitrator. The arbitrator shall award reasonable fees and costs or any portion thereof to the prevailing party to the same extent a court would be entitled to do so, in accordance with applicable law.

14.   **Savings**: Except as provided in paragraph 8, if any term or provision, or portion of this Agreement is declared void or unenforceable, the Parties agree that the court may modify the provision or portion of this Agreement declared void or unenforceable to the minimum extent necessary to make the provision enforceable.   If the court determines that said provision cannot be modified, said term or provision shall be severed and the remainder of this Agreement shall be enforced.

15.   **Right to Consult and Attorney; No Duress**:  You acknowledge that you may consult with an attorney for advice concerning this Agreement or the arbitration process at any time. You further acknowledge that this Agreement is entered into voluntarily and that your signature was not coerced

V090821



or made under duress. By accepting or continuing employment with the Company, you assent to this Agreement. You agree that arbitration is the exclusive remedy for all disputes, except as stated herein.

16. **Counterparts; Electronic Signatures**: The Parties acknowledge and agree this Agreement may be executed in counterparts and by electronic or digital signature (including any electronic symbol or process attached to, or associated with, a contract or other record and adopted by a person or entity with the intent to sign, authenticate or accept such contract or record) hereto or to any other certificate, agreement or document related to this transaction, and any contract formation or record-keeping through electronic means shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based recordkeeping system to the fullest extent permitted by applicable law, including the Federal **Electronic Signatures** in Global and National Commerce Act, the Illinois Electronic Commerce Security Act, or any similar state law based on the Uniform Electronic Transactions Act, and the Parties hereby waive any objection to the contrary.

17. **No Oral Representations**: Oral representations or oral agreements made before, during or after your employment with the Company regarding dispute resolution do not alter this Agreement.

18. **Controlling Agreement**: The Parties agree that this Agreement controls all other agreements (oral or written) that may have been in effect prior to the execution of this Agreement relating to the same subject matter. Any delay or failure to enforce any provision of this Agreement by either Party shall not constitute a waiver of such provisions or any other provision of this Agreement in the future. Any modification to the terms of this Agreement must be in writing and mutually agreed between the Parties as evidenced by signature.

**YOUR SIGNATURE BELOW ATTESTS TO THE FACT THAT YOU HAVE READ AND UNDERSTAND THE ABOVE TERMS. REGARDLESS OF WHETHER YOU SIGN THIS AGREEMENT, YOU HAVE AGREED AND ASSENTED TO THE TERMS OF THIS AGREEMENT BY REMAINING EMPLOYED AND/OR ACCEPTING EMPLOYMENT WITH COMPANY. YOU FURTHER UNDERSTAND THAT THIS AGREEMENT REQUIRES YOU TO ARBITRATE All DISPUTES THAT ARISE OUT OF YOUR EMPLOYMENT.**

**DO NOT SIGN UNTIL YOU HAVE READ THE ABOVE AGREEMENT. IT IS UNNECESSARY THAT THE COMPANY SIGN THIS AGREEMENT. THIS AGREEMENT IS BINDING ON YOU WHETHER OR NOT THE COMPANY SIGNS.**

David Ashman

(Print your name here)

*David Ashman*
6614ED9C00C24AD...

(Place your signature here)

11/28/2021

Date

GUARANTEED RATE, INC.

EB80CD55871A479...

By: Nikolaos Athanasiou

Title: Chief Operating Officer

11/29/2021

Date

V090821