# EXHIBIT L

# Compensation Terms

Vice President of
Mortgage Lending

Exclusively
prepared for
KEVIN CRAVENS



The Platform to Double
Your Purchase Business

## Guaranteed Rate Core Values

Here at Guaranteed Rate we strive for the industry leading value proposition for our loan officers, our referral sources and our customers.

### We grow for good.

We intend to be the #1 retail mortgage lender in the country, with the commitment that the more we grow, the more good we will do. We have a grow-for-good metric that measures the impact we have on our customers, referral partners, GR family and the communities that we serve. We encourage each other to live healthy, balanced lives and have a lot of fun doing it!

### We put the customer first.

We believe everyone deserves the same low rates and great service, whether they're a Wall Street big shot or a modest first-time homebuyer. We're absolutely committed to making sure every customer loves working with us so much that they can't wait to refer us to their family and friends.

### We work with the best of the best.

We started the company with this philosophy: Hire the best employees, build business with the best referral partners and work with the best mortgage partners. The best are never satisfied with the status quo, have a burning desire to deliver great results and always satisfy our customers with exceptional service. When you surround yourself with the best, life is great!

### We think big.

We go for it. We are bold in our ideas, pushing beyond what most people believe is possible. We believe in the law of attraction and can accomplish anything through positivity and working together as one team.

### We have grit.

We set meaningful, aggressive goals and tenaciously pursue them day after day, week after week. We accomplish these goals by overcoming obstacles and finding a way to WIN. We are relentless. We never give up. Ever.

### We have an owner's mentality.

We embrace a scrappy, entrepreneurial mindset and work as though we own the company. We never sacrifice long-term health for short-term gains. We are financially disciplined and challenge ourselves to be inventive and self-sufficient in everything we do. We will always invest in what matters to our customers, referral partners, GR family and the communities we serve.

### We take decisive action.

We move fast. We destroy bureaucracy, formality and fear of failure because quick delivery is important for our customers. If we see a problem or opportunity, we jump on it.

We make bold, thoughtful decisions while effectively managing risk and ensuring compliance.

### We demand excellence.

Our daily focus is to have a better value proposition than any other bank or mortgage company in the country for our customers, referral partners and GR family. WE have the highest standards. When we do our jobs with excellence, this business is easy—our referral partners are well served, and our customers keep coming back. Good enough, never is.

### We hold ourselves and others accountable.

We are not victims—we are masters of our fate. We honor the commitments we make and never say, "That's not my job." If we make a mistake, we own it, fix it and move forward. We seek transparency and embrace constructive conflict and criticism in order to learn and grow.

### We give a sh!t.

Being part of the GR family means caring deeply about our work, each other and our company. We take pride in what we do and how we do it. You can't work here unless you give a sh!t.

---

**The following document contains specific details related to your compensation structure.**

Please reach out to me with any questions.

Jeff Uniack
(310) 954-2675
jeff.uniack@rate.com



<div style="background:#D3272E;color:white;text-align:center">

# KEVIN CRAVENS
# COMPENSATION, CORPORATE OBJECTIVE AND LOAN PRICING SCHEDULE

</div>

This Compensation, Corporate Objective and Loan Pricing Schedule ("Schedule") to the Sales Compensation Plan and Agreement (the "Agreement") is dated as of **May 25, 2022** (the "Effective Date").

The purpose of this Schedule is to identify and confirm your Corporate Objective, loan pricing, Commissions and other compensation on and after the Effective Date.

All capitalized terms that are not defined in this Schedule shall have the meaning set forth in the Agreement.

You and the Company agree as follows:

## 1. YOUR PRODUCTION GOALS.

| Time Periods | Dollar Volumes of Funded Eligible Loans | Number of Funded Eligible Loans |
|---|---|---|
| The First 180 Days of Your Employment With The Company | $11,000,000 | 14 Eligible Loans |
| Each Year | $22,000,000 | 29 Eligible Loans |

## 2. YOUR DRAW

You will not receive a Draw.

## 3. YOUR CORPORATE OBJECTIVE AND LOAN PRICING.

| Corporate Objective | Minimum Lock Price For Eligible Loans |
|---|---|
| 160 Basis Points | 101.6 |

**Executive Management must approve any change to your Corporate Objective. In no event may your Corporate Objective be changed more than once every 90 days.**

Please see Section II(a) through (c) of the Agreement for more information about your Corporate Objective and Section II(d) for more information about loan pricing.

## 4. YOUR COMMISSIONS.

### (a) Amount of Your Base Commission

Your Base Commission for each Eligible Loan that you originate and that the Company funds during a calendar month are described in the Table below.

| Base Commission and Commission Floor | Amount of Your Base Commission |
|---|---|
| Base Commission | 96 Basis Points × the principal balance of each Eligible Loan |
| Base Commission "Floor" | Your Base Commission will never be less than $900[1] |
| Base Commission "Ceiling" | Your Base Commission will never be more than $10,500[2] |

**1.** The Base Commission Floor will apply to all Eligible Loans with principal balance less than **$93,750**.
**2.** The Base Commission Ceiling will apply to all Eligible Loans that (a) have a principal balance of **$1,093,750** or more, and (b) provide a net revenue to the Company (before my commission) of **$17,500**.

#### (b) Commission on Brokered Loans

An eligible brokered loan meets the following criteria: (1) you have exhausted all available loan products that the Company offers to the customers because those products do not meet the needs of your customer; (2) you have not improperly steered the consumer to any particular loan product; and (3) the loan has been submitted and approved through the brokered loan submission process ("Eligible Brokered Loan").

Brokered loan payouts for California subject properties will receive **seventy-five (75) Basis Points**. The Company agrees to pay you a commission of **fifty (50) Basis Points** on each Eligible Brokered Loan that you originate and is funded by a third-party lender for subject properties outside the state of California. You will receive commission consistent with the date the third-party lender pays the Company, not the date that the loan was funded by the brokered third party. You will not be paid on any loan that does not meet the definition of an Eligible Brokered Loan.

#### (c) Amount of Your Scorecard Bonus          Annual Value of $22,000
(Based on projected volume of $22 million x 10 bps)

The potential amount of your Scorecard Bonus is described in a separate "Retail Sales Performance Scorecard," which will be provided to you as a separate document.

You can earn **up to ten (10) additional basis points** on each Eligible Loan originated by you and funded by the Company by working efficiently. These basis point fall within a range that may change from time to time. The scorecard bonus is based on closing ratios, efficient application submissions, fee collections, minimizing rush requests, minimizing errors and submitting clean/high quality files to underwriting. The scorecard bonus also rewards submitting clean files that can be processed and closed quickly.

#### (d) Amount of Your Sign On Bonus

The Company will advance you a Sign On Bonus. The amount of the Sign On Bonus and when you will receive the advance of the Sign On Bonus is described in the Table below.

| Bonus Amount | When We Pay the Bonus to You |
|---|---|
| $40,000 | • Advanced on the **June 15, 2022,** payroll date, but not earned until the **731**st day of employment with the Company. |
| $40,000 | • Advanced on the **July 29, 2022,** payroll date, but not earned until the **731**st day of employment with the Company. |
| $80,000 | - - - |

The Company agrees to advance you a conditional signing bonus of eighty thousand dollars ($80,000), subject to all required taxes and withholdings ("Sign On Bonus"), payable on your first and fourth eligible payroll date, as described in the table above. The Sign On Bonus is contingent upon your continued employment with the Company for a period of two (2) years following the Effective Date. You agree that the Sign On Bonus shall not be deemed earned until such time that you have completed two (2) years of continuous employment with the Company following the Effective Date. If, prior to the two (2) year anniversary of the Effective Date, you resign or your employment is terminated by the Company for cause, you agree to repay the Company the

DocuSign Envelope ID: 5DFDBE1C-71D3-4696-9D5C-B31A913200EF

net amount of the Sign On Bonus within ten (10) days of such termination of employment and you agree not to seek a refund or credit for any amounts paid by the Company on your behalf for state and federal taxes.

You agree that any repayment due to the Company of the Sign On Bonus may be deducted to the extent permitted by law from any amounts due to you at the time of employment termination, including for wages, accrued vacation pay bonuses and commissions, and hereby expressly authorize the Company to make such deductions.

***Please see Section IV(d) of the Agreement for more information about your bonus.***

## 5. MARK R. JOHNSON WILL ACT AS THE PROCESS MANAGER FOR ELIGIBLE LOANS

You agree that Mark R. Johnson will act as the Process Manager for all of your loan origination. You agree that Mark R. Johnson will be your Process Manager for each Eligible Loan that (1) you source; (2) you originate, (3) the subject property is located in a state you and Mark R. Johnson are commonly licensed, (4) Mark R. Johnson is listed as the Process Manager, and (5) the Company funds. You understand and agree that Mark R. Johnson will receive the volume credit for such Eligible Loans. You agree that you will maintain the same Corporate Objective and the same Commission Cap, if applicable, as Mark R. Johnson.

## 6. MARK R. JOHNSON WILL ACT AS THE PROCESS MANAGER FOR ELIGIBLE BROKERED LOANS

You agree that Mark R. Johnson will act as the Process Manager for all of your loan origination. You agree that Mark R. Johnson will be your Process Manager for each Eligible Brokered Loan that (1) you source; (2) you originate, (3) the subject property is located in a state you and Mark R. Johnson are commonly licensed, (4) Mark R. Johnson is listed as the Process Manager, and (5) the an applicable third-party lender funds. You understand and agree that Mark R. Johnson will receive the volume credit for such Eligible Brokered Loans.  You agree that you will maintain the same Corporate Objective and the same Commission Cap, if applicable, as Mark R. Johnson.

## 7. MARKETING PLATFORM – ALL INCLUSIVE PLAN
### Annual Value of $8,150

You have elected to receive the All-Inclusive Plan.  This Plan provides you with a suite of tools, resources and materials to support your business.

**Plan Highlights (Standard)**

- Business Cards (250 per quarter)
- Professional Photo Editing
- Email Signature
- Database Upload
- Moving Announcement Postcards (500 cards)
- Moving Announcement Emails and Social Media Posts
- Personal GRI Website
- Email Marketing
- Name Badge
- Red Arrow Connect Basic
- Monthly Campaign Postcard (up to 500 per month)
- Monthly Email Blast
- Market Update Emails
- Pre-Approval Drip Emails
- Agent Partner Advantage Program Binder Presentation (1 binder)

## 8. BUSINESS DEVELOPMENT ALLOWANCE
### Annual Value of $4,400

This benefit will allow you to grow your business, expand your realtor relationships, plan events and much more.

- **Business Development Allowance**: Based on your expected annual volume numbers, you will be given a quarterly business development allowance of two Basis Points (2) multiplied by your quarterly Eligible Loan Volume.  This can be used for marketing and events pre-approved by the Company.  A complete list of all approved marketing and business development expenses can be found on the Company's intranet.  Any unused portion of this allowance will not roll over into the next quarter.

- **Reimbursement**: All marketing and events must comply with all federal, state and local laws to be eligible for reimbursement. All marketing and events expenses must be submitted for approval to the Company's Marketing and Compliance departments for approval prior to incurring the expense. Marketing, events and other expenses must be submitted for reimbursement in accordance with the Company's then-current expense reimbursement policies.

## 9. PROCESSING SUPPORT
### Annual Value of $5,800

**Mortgage Consultant/Loan Coordinators:** Guaranteed Rate will cover your cost of an MC and LC.

- Based on your expected number of annual Eligible Loans this is an additional value of **$5,800 per year** ($200/Eligible Loan x 29 Loans).
- The Mortgage Consultant transitions the loan from the point of sale by the VP to the processing of the application through underwriting. Additionally, the MC has good product knowledge and serves as a resource to back-up and complement the VP.

## 10. YOUR BENEFITS

In addition to your eligibility for the Commissions and Bonus outlined above, you may participate in the Company's standard employee benefits plans and programs provided you meet all eligibility requirements.

## 11. EXAMPLE

The following example is based on the assumption that you will originate 14 funded Eligible Loans during your first 180 days of employment with the Company, and 29 funded Eligible Loans during your first year of employment with the Company.

### Your Estimated Total Compensation For Your First Year of Employment With The Company

| | | |
|---|---|---|
| Scorecard Bonus Commission (estimated) | | $22,000 |
| Sign-On Bonus | | $80,000 |
| Marketing Platform | | $8,150 |
| Business Development | | $4,400 |
| Processing Support (estimated) | | $5,800 |
| **"Enhanced Value"** | | **$120,350** |
| Base Commissions | 96 Basis Points | $211,200 |
| **Total Compensation** | **150 Basis Points** | **$331,550** |

**I agree that this Schedule accurately reflects my understanding of the terms of my Draw, Corporate Objective, loan pricing, Commission, and Bonus.  I also agree that I must originate each loan at or above my Corporate Objective (taking into account all of the factors and deductions described in the Agreement) to be eligible to earn a Commission.**

Kevin Cravens

_____
(Print your name here)

DocuSigned by:

*kevin Cravens*
_____
(Place your signature here)

05/06/2022
_____
(Date)

Guaranteed Rate, Inc.

DocuSigned by:

_____
By: Nikolaos Athanasiou, Executive Vice President

05/09/2022
_____
(Date)



## RETAIL SALES COMPENSATION PLAN AND AGREEMENT – OUTSIDE SALES EMPLOYEE – ALL INCLUSIVE
## KEVIN CRAVENS — VICE PRESIDENT OF MORTGAGE LENDING — SANTA BARBARA, CA

All capitalized terms used in this Retail Sales Compensation Plan and Agreement (this "Agreement") have the meanings in Section XI below.

### I.    SCOPE OF EMPLOYMENT

You and the Company agree as follows:

**(a) Your Employment Obligations**

As an employee of the Company, you must comply with all of the following requirements.

a.   You must perform all of your employment obligations in a manner that is ethical, fair and compliant with all Requirements.

b.   You must price all loans at or above your Corporate Objective, as defined below, and comply with all Requirements when quoting and locking loan prices.

c.   You must collect all loan fees and manage all loan application, processing and related services in a manner consistent with applicable Requirements throughout the loan transaction, from loan application through funding.

d.   You must ensure that each applicant's loan terms and conditions are consistent with the applicable loan program, investor Requirements and all other applicable Requirements.

e.   You must ensure and confirm that each loan and related documents and information are processed and conducted only through the Company's approved loan origination system, approved automated underwriting systems, and the Company's payroll and accounting systems, as applicable.

f.   You must devote your full time and efforts to your employment with the Company.  During your employment with the Company, you may not be employed by any other Person.  You also may not provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities.

g.   You must offer only the loan products and programs approved by and made available through an origination channel of the Company.

h.   You must obtain and renew any and all applicable licenses, registrations and/or approvals required by a State governmental authority for each State in which you originate and/or intend to originate loans. The Company will terminate your employment if you (a) do not obtain any required license or other approval within 45 days after your date of employment, or (b) perform any services requiring a license or approval prior to obtaining such license or approval.

i.   You must conduct all of your other employment services in compliance with all other Requirements.

**(b) Outside Sales Employee**

As an Outside Sales Employee, you must visit regularly and frequently with clients and prospective clients, referral partners and potential referral partners in person to discuss the services that we offer, explain loan options, procedures, costs/benefits, etc.  These meetings will normally and customarily occur outside of the office.  The Company is committed to helping its employee be successful with this platform—if you believe you are not able to, or do not, comply with the duties set forth herein it is your obligation to notify the Company of any such deviation.

## II.  CORPORATE OBJECTIVE AND LOAN PRICING

### (a) How We Calculate the Corporate Objective

The amount of your Corporate Objective is set forth in the Schedule.

Your "Corporate Objective" is the amount of the Net Loan Revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

An "Eligible Loan" means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor in a manner that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"Deductible Expenses" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, _other than_ the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

"Borrower Expenses" include all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

You may choose the amount of your Corporate Objective, subject to certain limits and conditions.

You understand and acknowledge that the deduction of the amounts above do not constitute deductions from your Commission.  In the event that the deductions above are determined to be deductions from your Commission, you authorize the Company to deduct these costs, which are incurred directly for your benefit.

### (b) Corporate Objective Surplus

Net Loan Revenue received by the Company in excess of your Corporate Objective is referred to in this Agreement as a "Corporate Objective Surplus."

You may use a Corporate Objective Surplus to pay for Borrower Expenses.  If a Corporate Objective Surplus is not sufficient to pay all Borrower Expenses, the borrower must pay the remaining Borrower Expense directly.

Any Corporate Objective Surplus remaining after paying all Deductible Expenses and any Borrower Expenses may be credited back to the borrower at closing.

You may **not** receive any Corporate Objective Surplus at any time, whether in the form of a Commission or otherwise.  For example, you may **not** offset a Corporate Objective Shortfall with some or all of a Corporate Objective Surplus.

### (c) Corporate Objective Shortfall

In this Agreement, a "Corporate Objective Shortfall" means the amount of Net Loan Revenue received by the Company that falls short of your Corporate Objective with respect to a loan originated by you.  You may **not** price a loan that will result in a Corporate Objective Shortfall unless approved in writing by an officer or employee designated by Executive Management of the Company.  You understand and acknowledge that any such approval will be granted only under limited circumstances that comply with applicable Requirements.

If you price a loan that would result in a Corporate Objective Shortfall without written approval from a designated officer or employee of the Company, the Company may, in its sole discretion, refuse to close or fund that loan.

### (d) Loan Pricing

The amount at which you must price each loan is set forth in the Schedule.

You must price each loan at an amount necessary to meet or exceed your Corporate Objective. For example, assume that your Corporate Objective is 150 basis points. When you originate a loan, you must review the investor's current rate sheet and lock-in an interest rate for the loan that will result in 150 basis points or more of Net Loan Revenue for the Company, after subtracting all Deductible Expenses and any Borrower Expenses credited back to the borrower.

## III. COMPENSATION

### (a) Your Draw

#### (1) In General

Please refer to the Schedule to determine whether you have a Draw.

#### (2) The Amount of Your Draw

If you have a Draw, the amount of that Draw is set forth in the Schedule.

If you have a Draw, it will be paid during each full month you are employed by the Company. The Company will pay you the Draw in two equal installments on the fifteenth day and last day of each month. We will deduct from your Draw any federal, state and local payroll taxes and any health, disability, life or other benefits that you elect to receive. We will also deduct the amount of your Draw from your Commission and any other compensation described below and in the Schedule.

### (b) Fully Recoverable Draw and Recoverable Draw Subject to Minimum Wage

Please refer to the Schedule to determine whether you have a Fully Recoverable Draw or a Recoverable Draw Subject to Minimum Wage.

#### (1) Fully Recoverable Draw

If your Draw is a Fully Recoverable Draw and is greater than the amount of your Commission during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Fully Recoverable Draw Amount will be deducted from any future Commission earned by you. By entering into this Agreement, you authorize the Company to deduct any Fully Recoverable Draw Amounts and any other amounts that you owe to the Company from all future Commission until all Fully Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Fully Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment.

#### (2) Recoverable Draw Subject to Minimum Wage

If your Draw is a Recoverable Draw Subject to Minimum Wage and is greater than the amount of your Commission during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Recoverable Draw Amount Subject to Minimum Wage will be deducted from any future Commission earned by you, but never in an amount that would result in your being paid an amount less than minimum wage during the applicable pay period. By entering into this Agreement, you authorize the Company to deduct any Recoverable Draw Amount Subject to Minimum Wage and any other amounts that you owe to the Company from all future Commission until all Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment, but never in an amount that would result in your being paid an amount less than minimum wage during any applicable pay period.

## (c) Your Commissions

### (1) How We Calculate Your Commissions

Your Base Commission is based on a fixed percentage of the principal amount of each Eligible Loan that you originate, and is calculated in the specific manner described in the Schedule.

Please refer to the Schedule for a description of other Commissions that we will pay to you.

### (2) Commission for Loans that you assist the Company to Close

You will receive one hundred dollars ($100) per loan for any loan that you assist the Company to close because the initial loan originator has left the employment of the Company. Any loan that you assist in this manner will not be considered an Eligible Loan and will not be included in your Eligible Loan Volume as an eligibility requirement for President's Club, Production Bonuses or any other incentive in which Eligible Loan Volume is used as a measure.

### (3) Timing of Your Commission; Advances

Your Commission for each Eligible Loan will be calculated and advanced each month during the payroll period following the funding of the Eligible Loan in accordance with the Company's payroll practices. Your commission on each Eligible Loan that you originate and the Company funds is an advance and not earned until the Company has determined that a Recapture Event has not occurred in connection with the Eligible Loan. The Recapture Event period expires 180 days after the sale of the Eligible Loan by the Company on the secondary market, at which point your commission will be deemed earned ("Earned Commissions").

### (4) Recapture Event

A loan has a "Recapture Event" if (i) the Company determines that your Commission or other compensation is greater than the correct amount owed under this Agreement, or there are any Fully Recoverable Draw Amounts, Recoverable Draw Amounts subject to Minimum Wage, or other negative balances or other amounts that you owe the Company under this Agreement, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (v) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed by the Company to a borrower. A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the Borrower.

If a Recapture Event occurs for a loan before the Company has paid you the related Commission, the Company will not pay you part or all of the Commission, as the case may be.

If the Company has paid you a Commission for a loan you originated prior to the occurrence of a Recapture Event, you must repay all or part of the Commission, as the case may be, to the Company immediately. If you do not repay these amounts, the Company will deduct these amounts from your future Commission or other future compensation. If you owe any of these amounts to the Company after your employment with the Company ends, you must pay all such amounts within ten calendar days after the last day of your employment.

### (5) Monthly Commission Statement Must Be Accurate

You must ensure that each of your monthly Commission statements are accurate by reviewing all of these Commission statements online approximately one week prior to each payroll date. You must submit any questions or concerns to the Commissions Department before the applicable pay date. The Company will deny any change submitted more than 15 days after any of your Commission statements is issued

## IV.   ENDING YOUR EMPLOYMENT WITH THE COMPANY

### (a) You Are an Employee "At Will"

Your employment with the Company is "at-will."  This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason.  See Section IV(c) below for information about the Company's payment of any Commission after your employment with the Company has ended.

### (b) Termination for Cause

The Company may terminate your employment for Cause if: (i) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (ii) you violate Company policies, procedures or directives, (iii) you fail to comply with the terms of this Agreement, (iv) you fail to perform duties reasonably requested by the Company, and (v) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, and (vi) you take an action or fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry.

### (c) Commissions Paid After Your Employment Ends

After your employment with the Company ends for any reason other than for "Cause," you will receive all earned Commissions for each Eligible Loan that was originated by you and was funded within 30 calendar days after your last day of employment, unless otherwise provided in this Agreement.  You will not be paid any Commission for any loan that funds more than 30 calendar days after your last day of employment.

If the Company terminates your employment for "Cause," the Company will pay to you your then-current accrued and unpaid Commissions.  The Company will not pay to you any other Commission that is not accrued.

The Company may, in its sole discretion, delay the advance of your unearned Commissions for any loan up to 120 calendar days from your last day of employment with the Company.

### (d) Bonus not Paid After Your Employment Ends

You must be employed by the Company and must otherwise satisfy all applicable conditions to be eligible to receive any bonus payments.  You will not receive any bonus payment which comes due following the end of your employment with the Company.

## V.   YOUR CONFIDENTIALITY OBLIGATIONS; NON-SOLICITATION

You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section V, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

### (a) Confidential Information

During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria, and training techniques, business goals, strategic plans, promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of the Company and its business and operations); (b) information for which the Company is subject to

confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents, materials and information belonging or relating to the Company (collectively "Confidential Information").  The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.

**(b) Use of Company's Confidential Information**

As consideration for your employment, you will not use any Confidential Information for your own benefit, or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity.  You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company.  However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for your actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions, (iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

**(c) Representations and Warranties/Indemnification**

You represent and warrant to the Company that neither you nor anyone acting on your behalf has:  (1)  taken, accepted, copied, or misappropriated any confidential, proprietary, or trade secret documents, data, or information acquired from any former employer or otherwise; (2) transmitted, communicated or divulged any confidential, proprietary or trade secret information from any former employer or otherwise to the Company or its employees; (3) used any former employer's confidential, proprietary or trade secret information in connection with your employment with the Company, including but not limited to any loan origination activity; and (4) violated any post-employment restrictive covenants or obligations you owe any former employer. You further represent and warrant that you will not engage in any of the foregoing conduct during the course of your employment with the Company.

You shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Subsection. In addition to any and all other obligations of you hereunder, you agree that you will pay the reasonable attorney's fees of the Company incurred in enforcing the obligations hereunder. The indemnification obligations hereunder shall survive the termination of this Agreement and your employment with the Company.

**(d) Non-Solicitation**

In this Agreement, "Restricted Period" means the period beginning with the first day of your employment with the Company and ending 24 months after the last day of your employment.

**(i) Employees**

During the Restricted Period, you may not, directly or indirectly, hire, solicit, or encourage any Person employed by the Company during your last 12 months of employment with the Company or during the

DocuSign Envelope ID: 5DFDBE1C-71D3-4696-9D5C-B31A913200EF

remainder of the Restricted Period to end their employment with the Company and/or join you as a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship. During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

You may ask the Company to provide you with written consent to engage in any of the foregoing activities. The Company may approve or deny any such request in the Company's sole discretion.

**If you fail to comply with any provision of this Section V(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance**.  Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement.  You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section V(d), and is not a penalty.  You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section V(d).

### (ii) Vendors

During the Restricted Period, you will not, for yourself or on behalf of any other Person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of the Company, the identity of whom you learned during your employment with the Company.  This provision does not apply to any such Person, the identity of whom you learned prior to your employment with the Company.

### (e) Enforcement; Remedies

You covenant, agree and recognize that because the breach or threatened breach of the covenants, or any of them, contained in Section V hereof will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants and agreements contained in this Section V to the fullest extent allowed by law.  Nothing herein shall be construed as prohibiting the Company, and its respective successors and assigns, from pursuing all legal or equitable remedies that may be available to them for any such breach, including the recovery of damages from you.

### (f) Construction

You hereby expressly acknowledge and agree as follows:

(i) the covenants set forth in Section V are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and

(ii) each of the covenants set forth in Section V is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

In the event that any provision of this Section V shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration thereof of any such covenant, or for any other reason, such invalidity or unenforceability shall attach only to the particular aspect of such provision found invalid or unenforceable as applied and shall not affect or render invalid or unenforceable any other provision.  This Section V shall be construed as if the provision or other basis on which such provisions has been determined to be overly broad had been more narrowly drafted so as not to be invalid or unenforceable.

## VI.   LIMITS ON YOUR AUTHORITY

You are not authorized to (a) underwrite or approve any loan, (b) bind the Company under any agreement, lease, commitment or other obligation, (c) incur expenses on behalf of the Company, unless such expense has

been expressly approved in writing by the Company. You must inform each vendor and potential vendor that you are not authorized to bind the Company.

## VII. ARBITRATION/CLASS AND COLLECTIVE WAIVER

Any disputes relating to this Schedule and the Compensation Terms are subject to the terms of the mutual arbitration agreement between You and the Company, whether set forth in the Employment Terms, Compensation Terms or a separate arbitration agreement which requires You to resolve disputes with the Company on an individual basis through final and binding arbitration.

## VIII. APPLICABLE LAW; VENUE

This Agreement shall be governed by and construed in accordance with the laws of the State California, without regard to the conflicts of laws provisions therein. You irrevocably consent to the exclusive jurisdiction of the state and federal courts located in the county in which you are employed or, if you work from home, in the county where the nearest Company office is located for the purposes of any action or proceeding relating to or arising out of this Agreement and/or your employment with the Company.

## IX. ATTORNEYS' FEES AND COSTS; INJUNCTIVE RELIEF

The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend and/or prosecute this Agreement. You acknowledge that a breach of any provision of this Agreement will cause irreparable harm to the Company and that monetary damages will be inadequate and may be difficult or impossible to ascertain. Therefore, in the event of any such breach, or threatened breach, in addition to all other remedies, the Company shall have the right to require you to fulfill your obligations by way of temporary and/or permanent injunctive relief.

## X. MISCELLANEOUS

This Agreement, together with any Schedule, is complete and reflects all of the agreements, representations and warranties between you and the Company and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement. The Company reserves the right to terminate or modify this Agreement at any time. Any delay or failure to enforce any provision of this Agreement by the Company shall not be considered a waiver of such provisions or any other provision of this Agreement.

This Agreement will be effective only after it has been fully executed by you and either the Company's President and CEO or the Chief Operating Officer. This Agreement may only be amended, changed or modified by a writing executed by the Company and the Employee. Notwithstanding the foregoing, the Company may change or amend any Schedule or the amount or manner in which your compensation and related matters are calculated by providing written notice to you.

To the extent a court of competent jurisdiction determines any provision is not enforceable, the parties agree that the court may modify the provision to the minimum extent necessary to make the provision enforceable. Further, any such invalid provision shall not invalidate the remaining provisions, which shall remain in full force and effect.

You acknowledge and agree that the Company owns the sole and exclusive right, title and interest in and to any and all inventions, discoveries, designs, original works of authorship, developments, concepts, know-how, products, improvements or trade secrets that you conceive, create, develop, discover, reduce to practice, make or acquire, in whole or in part, either solely or jointly with another or others, during the course of your employment with the Company (collectively, "Works"). All Works shall be deemed the Confidential Information of the Company and you will promptly disclose all Works to the Company. You agree that all copyrightable

DocuSign Envelope ID: 5DFDBE1C-71D3-4696-9D5C-B31A913200EF

Works that have been or are prepared by you within the scope of your employment are "works for hire" under the U.S. Copyright Act and that the Company will be considered the author thereof. To the extent that any of the Works is determined not to constitute a work made for hire, you hereby assign and transfer to the Company all of your rights, title and interests in and to any and all Works and all related copyrights, trademarks, patents, trade secrets, and other intellectual property and proprietary rights therein ("IP Rights"). You further waive, to the extent permitted by applicable law, all "moral rights" you have in and to the Works. During your employment with the Company and afterward, you agree to sign additional documents related to the Company's ownership and registration of IP Rights and you hereby agree to execute such other documents without additional consideration. If you fail to execute any such documents, you irrevocably appoint the Company and its authorized officers and agents as your agent and attorney-in-fact to act for to execute such documents on your behalf. This appointment is coupled with an interest in the Works and IP Rights. **NOTICE OF STATUTORY EXCEPTION: The assignment contained in this paragraph does not apply to any Work that qualifies fully as a non-assignable invention under Section 2870 of the California Labor Code, which is set forth below.**

<div align="center">

**Section 2870 of the California Labor Code**

</div>

(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

## XI. DEFINITIONS

**"Agreement"** means this Retail Sales Compensation Plan and Agreement and any Schedule hereto.

**"Authority"** means any federal, state or municipal governmental agency or regulatory authority, including, but not limited to, the Consumer Financial Protection Bureau, the U.S. Department of Justice, any State attorney general, and any state financial services or consumer protection regulatory authority.

**"Basis Point"** means a unit of measure equal to one hundredth of one percent. One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

**"Borrower Expenses"** mean all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

**"Cause"** has the meaning set forth in Section IV(b).

**"Commission"** means the amount of your variable compensation earned from your loan origination activities and identified as commissions in this Agreement and in the Schedule.

**"Company"** means Guaranteed Rate, Inc.

**"Confidential Information"** has the meaning set forth in Section V(a).

**"Corporate Objective"** means the amount of net revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

**"Corporate Objective Shortfall"** means the amount of Net Loan Revenue that falls short of your Corporate Objective with respect to a loan originated by you.

**"Corporate Objective Surplus"** means the amount of Net Loan Revenue that exceeds your Corporate Objective with respect to an Eligible Loan originated by you.

**"Deductible Expenses**" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, _other than_ the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

**"Draw"** means the non-commissioned dollar amounts that an employer pays a loan officer as an advance of a Commission.

**"Early Payment Default"** means a loan originated by you that defaults during an "Early Payment Default Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

**"Early Payoff"** means a loan originated by you that pays off in whole or in part during an "Early Prepayment Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

 **"Eligible Loan"** means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor at a price that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"**Fully Recoverable Draw**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Fully Recoverable Draw Amount"** means the dollar amount by which your monthly Draw exceeds your Commission during any month, which amount may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Manager**" means your direct supervisor.

**"Net Loan Revenue"** means the net revenue received by the Company in connection with the funding and sale of an Eligible Loan.

 **"Outside Sales Employee"** means an outside sales employee, as defined in Section 13(a)(1) of the Fair Labor Standards Act, who are exempt from both minimum wage and overtime pay requirements under the Fair Labor Standards Act.

**"Person"** means any natural Person, corporation, limited liability, partnership, sole proprietorship or any other entity.

**"Recapture Event"** has the meaning set forth in Section III(c)(3) of this Agreement.

**"Recoverable Draw Subject to Minimum Wage"** has the meaning set forth in Section III(b)(2) of this Agreement.

DocuSign Envelope ID: 5DFDBE1C-71D3-4696-9D5C-B31A913200EF

"**Recoverable Draw Subject to Minimum Wage Amount**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, in the manner described further in Section III(b)(2) of this Agreement.

"**Requirements**" means all (a) applicable laws, rules, regulations, and orders, (b) Company policies, procedures, guidelines and directives (Links to the Company's policies and procedures can be found on the Company's Intranet and also in the Company's employee handbook), (c) applicable investor policies, procedures, guidelines and other requirements, and (d) terms, conditions and obligations in this Agreement.

"**Schedule**" means the Compensation, Corporate Objective and Loan Pricing Schedule to this Agreement.

"**You**" or "**your**" means you, the employee, in your capacity as a Vice President of Mortgage Lending.

*I hereby acknowledge that I have reviewed the Guaranteed Rate Sales Compensation Plan. I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid. I agree to comply with and to be bound by the terms of the Plan.*

| | |
|---|---|
| Kevin Cravens | Guaranteed Rate, Inc. |
| (Print your name here) | |
| *kevin Cravens* | *[signature]* |
| (Place your signature here) | By: Nikolaos Athanasiou, Chief Operating Officer |
| 05/06/2022 | 05/09/2022 |
| (Date) | (Date) |

DocuSign Envelope ID: 5DFDBE1C-71D3-4696-9D5C-B31A913200EF

## <u>Out of State Referral Acknowledgement</u>

As a licensed loan officer, you are obligated to ensure that you are complying with the SAFE Act to protect your license and the Company's licenses. The Company has designed a compliant method for a VP to refer a loan to a licensed individual in states in which he or she may not be licensed. Under the program, when an unlicensed individual receives an unsolicited lead in a state in which he or she is not licensed, the referral is to be sent to the DLO Desk. Below you will find a non-exhaustive list of what you may or may not do as the Process Manager:

The Process Manager may:

- Generally describe for a borrower the loan process from a high level/educational perspective (i.e. definition of a mortgage, LE, etc.)
- Provide general explanations or descriptions in response to consumer inquiries (but nothing specifically related to the consumer's situation)
- Help in arranging the loan closing or other aspects of the loan process, provided that any communication that includes a discussion about loan terms only verifies terms already agreed to by the borrower and the DLO

The Process Manager **MAY NOT** (ONLY the licensed VP may engage in these activities):

- Discuss particular loan programs, rates, credit qualification scenarios, etc. (e.g. state, "The best product for you would be a 7/1 ARM," "I think I could lock your rate at 4.65%," "I don't think you qualify for that bond program," etc.)
- Issue pre-approval letters, even if in the name of the licensed individual
- Complete, or assist directly or indirectly in taking, an applicant's 1003
- Run credit or lock the loan
- Discuss credit scores needed to qualify or other financial information related to a borrower's ability to qualify
- Discuss loan options or present a loan summary
- Solicit loan applications in states in which you're not licensed

By signing below, you acknowledge that if the Company determines you have engaged in unlicensed activity, it revokes your ability to refer loans in the future, or take other disciplinary action, up to and including termination as it deems appropriate. Furthermore, you will not be eligible to receive compensation for any referred transaction when unlicensed activity is identified. Lastly, your signature below confirms your complete understanding of the requirements around the SAFE Act and what constitutes licensable activity.

Signed: _Kevin Cravens_
DocuSigned by:
A50FB5F8A8FE493...

Date: _05/06/2022_

DocuSign Envelope ID: 5DFDBE1C-71D3-4696-9D5C-B31A913200EF



## VOLUNTARY MUTUAL AGREEMENT TO ARBITRATE CLAIMS
### (CALIFORNIA EMPLOYEES)

This Voluntary Mutual Agreement to Arbitrate Claims ("**Agreement**") is agreed to in connection with the commencement or the continuation of the undersigned employee's employment with Guaranteed Rate, Inc. ("**GRI**") and any of its Affiliates (collectively, the "**Company**")[1]. For these purposes, an "**Affiliate**" means any entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, GRI, and the "Company" includes all employees, officers, directors, shareholders, agents, benefit plans, subsidiaries and related entities of the Company (past, present, or which may be formed in the future). This Agreement refers to the undersigned as "you" or "your". This Agreement also refers to you and the Company together as the "**Parties**" and each individually, as a "**Party**."

1.  **Voluntary Agreement.** *You understand the Company has proposed this arbitration agreement to you and you have the right to accept or reject it. The Company proposes arbitration for a number of reasons including the fact that it is generally a more private and efficient way to resolve disputes. For example, an arbitration hearing usually occurs in a private office building whereas other litigation occurs in a courthouse that is open to the public at large. Additionally, resolving disputes in court can take years depending on the court docket, whereas arbitration usually proceeds more quickly. Further, you understand that you retain the same substantive rights in arbitration as you would in court. You also understand an arbitrator can award the same things that a court or jury could award, including reinstatement and money damages. Finally, you understand the Company does not retaliate, discriminate, threaten, or terminate employees who refuse to consent to arbitration.*

2.  **Disputes are Subject to Binding Arbitration Under the FAA:** You acknowledge and agree that you and the Company, will utilize binding arbitration as the sole and exclusive means to resolve all claims (legal or equitable), disputes or controversies arising out of, relating to, or resulting from your employment with the Company or the termination of your employment with the Company, except as provided below. Each Party specifically waives and relinquishes its respective rights to bring a claim against the other in a court of law, except as provided below, and this waiver will be equally binding on any person who represents or seeks to represent you or the Company in a lawsuit against the other in a court of law. Except as provided below, both of the Parties agree that any claim, dispute or controversy that you may have against the Company, or the Company may have against you, will be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act ("**FAA**"), including, but not limited, to questions regarding the scope of arbitration or the jurisdiction of the arbitrator, and any such claims against the Company's brands, concepts, affiliates, subsidiaries, parents, related entities, owners, directors, officers, managers, employees, agents, or alleged joint employers. Additionally, the binding arbitration will be determined in conformity with the procedures of the California Arbitration Act ("**CAA**"), Cal. Code Civ. Proc. §§ 1280 et seq., including Section 1283.05 and all of the CAA's other mandatory and permissive rights to discovery; however, the court may not refuse to enforce this Agreement or stay the arbitration proceeding under Cal. Code Civ. Proc. § 1281.2(c).

3.  **Application of FAA; Exceptions to Arbitration:** You and the Company agree the FAA applies to this Agreement. You and the Company also agree the scope of this Agreement includes all disputes, whether based on tort, contract, or statute. This includes any claims of discrimination, harassment and/or retaliation, whether they be based on the California Fair Employment and Housing Act, Title VII of the Civil Rights Act of 1964, as amended, or any other state or federal law or regulation, equitable law, or otherwise. However, this Agreement does not cover claims arising under the National Labor Relations Act brought before the National Labor Relations Board, claims for medical and disability benefits under the California Workers' Compensation Act, Employment Development Department claims, or as otherwise required by state or federal law. It also does not prevent you from filing and pursuing proceedings before the California Department of Fair Employment and Housing or the United States Equal Employment Opportunity Commission. However, if you pursue a claim following the exhaustion of such administrative remedies, that claim would be subject to this Agreement. It also does not prevent you from filing and pursuing proceedings before the California Department of Industrial Relations, Labor Commissioner's Office, under Cal. Lab. Code § 98. However, if you or the Company pursue a de novo review of the Labor Commissioner's order, that claim would be subject to this Agreement. ***By this***

---

[1] The Company is your legal employer. Although this Agreement is between you and the Company, you understand and agree it is for your benefit, the Company's benefit, and the benefit of any alleged joint-employer, alter ego, or agent of your employer.

DocuSign Envelope ID: 5DFDBE1C-71D3-4696-9D5C-B31A913200EF



*binding arbitration provision, the Parties gives up their respective rights to trial by jury of any claim one Party may have against the other Party that may arise out of or be related to your employment or termination of your employment, except as stated herein*.

4.   <u>**Individual Capacity**</u>: You and the Company will bring all claims brought under this Agreement in an individual capacity.

5.   <u>**Waiver of Right to Bring Class or Collective Claim:**</u> This Agreement will not be construed to allow or permit the consolidation or joinder of other claims or controversies involving any other employees, or permit such claims or controversies to proceed as a class, collective or representative action. By signing this Agreement, you are agreeing to waive any substantive or procedural rights you may have to sue on a class, collective or representative basis. No court or arbitrator will have the authority under this Agreement to order a class, collective, or representative action to proceed in arbitration.

6.   <u>**Waiver of Right to Bring Action as a Private Attorney General**</u>: To the extent allowable under applicable law, this Agreement will not be construed to allow or permit claims brought on behalf of any state or government as a private attorney general, including claims under California Private Attorneys General Act of 2004 ("**PAGA**"). By signing this Agreement, you are agreeing to waive any substantive or procedural rights you may have to sue on as a private attorney general. No court or arbitrator will have the authority under this Agreement to order claims brought on behalf of any state or government as a private attorney general, including claims under PAGA, to proceed in arbitration.

7.   <u>**Disputes Concerning Class or Collective Action Waiver**</u>: The Parties agree that a court of competent jurisdiction will be the sole determiner of any disputes regarding whether this Agreement allows for class, collective or representative arbitration. A court of competent jurisdiction will decide all issues concerning the enforceability of the class, collective, or representative waivers herein. The Parties agree and hereby stipulate that an arbitrator has no authority or jurisdiction regarding these issues.

8.   <u>**Determinations Concerning Application of FAA and Class or Collective Waivers**</u>: You and the Company agree that a court of competent jurisdiction will be the sole determiner of whether the FAA applies to this Agreement and whether the class, collective and representative action waivers contained in this Agreement are valid and enforceable.

9.   <u>**Invalidity of Class or Collective Action Waiver:**</u>  If a court determines that the prohibition on class, collective, private attorney general, or representative actions is invalid or unenforceable, you and the Company waive any right to arbitration of the class, collective, private attorney general, or representative actions. Instead, you and the Company agree that such claims will proceed in court and not before an arbitrator, but only after you and the Company arbitrate any claims subject to this Agreement.

10.   <u>**Collective Bargaining:**</u> This Agreement is not intended to interfere with your rights to collectively bargain, to engage in protected, concerted activity, or to exercise other rights protected under the National Labor Relations Act, and you will not be subject to disciplinary action of any kind for opposing the arbitration provisions of this Agreement.

11.   <u>**Initiating a Claim**</u>: A Party wishing to initiate arbitration must notify the other Party in writing by hand delivery, overnight courier or certified mail. The notice should identify the Party requesting arbitration by name, address, and telephone number; the facts upon which the claim is based, the persons involved, the date and location of any occurrences giving rise to the claim, and the law(s) allegedly violated; and the remedy requested. Notice to the Company must be sent to Guaranteed Rate, Inc. Attention Legal Department at 3940 N. Ravenswood, Chicago, IL 60613. The notice must include the following language capitalized and bolded: "**ARBITRATION DEMAND, ATTENTION LEGAL DEPARTMENT**." Notice to you must be sent to your most recent residence address in the Company's records. Notice must also be sent to Judicate West at 1851 East First Street, Suite 1600, Santa Ana, CA 92705 or at the most recent address of Judicate West.

12.   <u>**Arbitrator Selection/Conduct of Proceedings and Hearing**</u>: The Parties agree to use Judicate West for arbitration. An arbitrator will be selected in accordance with the then-current rules of Judicate West for selecting an arbitrator.  All California rules of pleading (including the right of demurrer), all rules of evidence, all rights to resolution of the dispute by means of motions for summary judgment, judgment on the pleadings, judgment under Code of Civil Procedure Section 631.8, and Federal Rule of Civil Procedure 68 ("Offer of Judgment") will apply and be observed; however, if any such rules conflict with the terms of this



Agreement, this Agreement will control. The arbitrator will have the immunity of a judicial officer from civil liability when acting in the capacity of an arbitrator, which immunity supplements any other existing immunity. Likewise, all communications during or for the arbitration proceedings are privileged under Cal. Civil Code Section 47(b). As reasonably required to allow full use and benefit of this Agreement's modifications to the procedures under the CAA, the arbitrator will extend the times set by the CAA for giving notices and setting of hearings. Resolution of all disputes shall be based solely upon the law governing the claims and defenses pleaded, and the arbitrator may not invoke any basis (including but not limited to, notions of "just cause") other than such controlling law.

13. **Costs of Arbitration and Attorney Fees**: The Company will pay all costs unique to arbitration, including the arbitration fees and expenses. However, if you are the Party initiating the claim, you shall be responsible for contributing an amount equal to the filing fee to initiate the claim in your home state, unless the arbitrator determines such fee should be waived due to a showing of reasonable need. Except as provided in Federal Rule of Civil Procedure 68 or as determined by the arbitrator in accordance with applicable legal standards, each Party shall pay its own attorney fees and any costs that are not unique to the arbitration. Any dispute as to whether a cost is unique to arbitration shall be resolved by the arbitrator. The arbitrator may award reasonable fees and costs or any portion thereof to the prevailing party to the same extent a court would be entitled to do so, in accordance with applicable law. Finally, you and the Company agree that any arbitration fees and costs invoiced to the Company shall be due 30 calendar days following the deadline stated on the applicable invoice, and if there is no deadline stated, 30 days following the Company's receipt of the applicable invoice from the arbitration provider.

14. **No Oral Representations**: Oral representations or oral agreements made before or after your employment regarding dispute resolution do not alter this Agreement.

15. **Savings**: Except as provided in paragraph 8, if any term or provision, or portion of this Agreement is declared void or unenforceable, said term or provision shall be severed and the remainder of this Agreement shall be enforceable.

16. **Location and Choice of Law**: The arbitration hearing(s) for all claims brought under this Agreement will be held in California in the county in which you are or were last employed or engaged by, or applied for employment or other association with, the Company, as applicable, or any other county where venue is otherwise appropriate under statute. The law of California will apply.

17. **Right to Consult an Attorney; No Duress**: You acknowledge that you may consult with your own attorney for advice concerning this Agreement. You further acknowledge that this Agreement is entered into voluntarily and that your signature was not coerced or made under duress. By accepting or continuing employment with the Company, you assent to this Agreement. You agree that arbitration is the exclusive remedy for all disputes, except as stated herein.

18. **Counterparts; Electronic Signatures**: The Parties acknowledge and agree this Agreement may be executed in counterparts and by electronic or digital signature (including any electronic symbol or process attached to, or associated with, a contract or other record and adopted by a person or entity with the intent to sign, authenticate or accept such contract or record) hereto or to any other certificate, agreement or document related to this transaction, and any contract formation or record-keeping through electronic means shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based recordkeeping system to the fullest extent permitted by applicable law, including the Federal **Electronic Signatures** in Global and National Commerce Act and the California Uniform Electronic Transactions Act, and the Parties hereby waive any objection to the contrary.

19. **Controlling Agreement**: The Parties agree that this Agreement controls (to the extent they conflict) all other agreements (oral or written) that may have been in effect prior to the execution of this Agreement relating to the same subject matter. Any delay or failure to enforce any provision of this Agreement by either Party shall not constitute a waiver of such provisions or any other provision of this Agreement in the future. Any modification to the terms of this Agreement must be in writing and mutually agreed between the Parties as evidenced by signature.

DocuSign Envelope ID: 5DFDBE1C-71D3-4696-9D5C-B31A913200EF



20. **Discovery**: The provisions of California Code of Civil Procedure Section 1283.05 or its successor section(s) are incorporated herein and made a part of this Agreement. In any arbitration proceeding under this Agreement, the Parties shall have the same right to discovery, including third-party discovery, as would be available in a proceeding in California Superior Court, as provided in section 1283.05 of the California Code of Civil Procedure.

**DO NOT SIGN UNTIL YOU HAVE READ THIS AGREEMENT. BY SIGNING, YOU VOLUNTARILY AGREE AND ASSENT TO THE TERMS OF THIS AGREEMENT. YOU UNDERSTAND THAT THIS AGREEMENT REQUIRES THE YOU AND THE COMPANY TO ARBITRATE ALL DISPUTES THAT ARISE OUT OF YOUR EMPLOYMENT. YOU AGREE IT IS UNNECESSARY FOR THE COMPANY TO SIGN THIS AGREEMENT FOR IT TO BE BINDING, WHICH MEANS THIS AGREEMENT IS BINDING ON YOU AND THE COMPANY WHETHER OR NOT THE COMPANY SIGNS.**

Kevin Cravens
_____
(Print your name here)

DocuSigned by:
_Kevin Cravens_
A50FB5F8A8FE493...
_____
(Place your signature here)


05/06/2022
_____
Date

GUARANTEED RATE, INC.

DocuSigned by:
EB80CD5587 1A479...

By: Nikolaos Athanasiou
_____

Title: _____


05/09/2022
_____
Date