**IN THE MATTER OF THE JAMS ARBITRATION BETWEEN**

| | | |
|---|---|---|
| GUARANTEED RATE, INC.,<br>Claimant,<br><br>v.<br><br>DAVID BREAUX,<br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 5220008190<br><br>CLAIMANT'S<br>PRE-HEARING<br>BRIEF |

**GUARANTEED RATE, INC.'S PRE-HEARING BRIEF**

Guaranteed Rate, Inc. ("GRI"), by its attorneys, submits this Pre-Hearing Brief in support of its Complaint and Demand for Arbitration and against Respondent David Breaux's Answer to Claimant Guaranteed Rate, Inc.'s Demand for Arbitration, Affirmative Defenses, and Counterclaim ("Counterclaim").

**INTRODUCTION**

David Breaux ("Respondent" or "Breaux") joined Guaranteed Rate, Inc. ("GRI") as a Vice President of Mortgage Lending after a successful tenure with U.S. Bank in a similar role originating mortgage loans. Breaux started at GRI on February 17, 2020. After over two successful years at GRI, Respondent and GRI negotiated a Retention Bonus. The purpose of the Retention Bonus was to incentivize Respondent's continued employment with GRI. The terms of that Retention Bonus were set forth in the "Sales Compensation Plan – Addendum 8" ("Retention Bonus Addendum"). Pursuant to the Retention Bonus Addendum, GRI advanced Respondent $125,000.00 as a Retention Bonus. Under the terms of the Retention Bonus Addendum, the funds advanced would not be earned until Respondent completed another two years of employment with GRI. If Breaux resigned his employment with GRI prior to two years after the execution of the Retention Bonus Addendum, Respondent would be required to repay the Retention Bonus in full.

Prior to completing those two additional years of employment with GRI, Respondent voluntarily resigned his employment at GRI to work elsewhere as a loan originator. To date, Respondent refuses to repay the Retention Bonus, causing damages to GRI that continue to accrue. As such, GRI brings its claim against Respondent for breach of the Retention Bonus Addendum.

In Respondent's Counterclaim, he brings a slew of counterclaims relating to his employment at GRI. As set forth below, Respondent's allegations rely on an unfounded argument that he was misclassified as an outside salesperson, despite both the clear terms of his employment contract and the practical considerations of his job duties at GRI. The arguments set forth in Respondent's counterclaims are undermined by his own deposition testimony, which GRI anticipates being mirrored by the evidence submitted during this hearing. Respondent brings additional counterclaims based on an improper calculation of the commissions he received during his GRI tenure. Respondent's allegations that he was improperly paid are not based on any reasonable contractual interpretation contained in the applicable agreements between him and GRI.

## FACTUAL BACKGROUND

### A. Respondent's Compensation at GRI.

On February 17, 2020, Respondent began his employment at GRI as a Vice President of Mortgage Lending, also referred to as a loan officer. In connection with starting his employment at GRI, Respondent signed an offer letter, attached hereto as Exhibit 1. Respondent and GRI also executed an employment agreement titled "Compensation Terms – Vice President of Mortgage Lending While Using Temporary Authority" ("Compensation Plan"), attached hereto as Exhibit 2. Respondent and GRI expressly agreed that the Compensation Plan could "only be amended, changed or modified by a writing executed by the Company and the Employee." (Ex. 2, at

GRI000021.) Throughout Respondent's tenure several amendments were memorialized by the parties. Central to GRI's claims against Respondent is the amendment titled "Sales Compensation Plan – Addendum 8" ("Retention Bonus Addendum"), attached hereto as Exhibit 3.

Under the Retention Bonus Addendum, GRI agreed to advance Respondent a Retention Bonus in the amount of $125,000.00. (Ex. 3.) Respondent agreed that the Retention Bonus would constitute an advance of funds that remained subject to repayment unless and until Respondent achieved two (2) years of continuous employment with GRI from the effective date of the Retention Bonus Addendum, defined as April 15, 2022. (*Id.*) GRI advanced those funds on April 15, 2022. (*See* April 15, 2022 Paystub, attached hereto as Exhibit 4.)

On September 15, 2023, after less than the two years required to earn the Retention Bonus, Respondent voluntarily resigned his position with GRI. (*See* Resignation Letter, attached hereto as Exhibit 5.) Respondent did not achieve two (2) full years of continuous employment and therefore failed to earn the Retention Bonus under the terms of the Retention Bonus Addendum.

**B. Respondent's Role as a Vice President of Mortgage Lending at GRI.**

Respondent's job duties as a loan officer and GRI's expectations for Respondent's performance were set forth in the employment agreements he signed with GRI. The offer letter outlined that Respondent was being offered a position at GRI as a Vice President of Mortgage Lending; that he would receive certain employment benefits; that this position was considered "exempt," meaning he would not be entitled to overtime pay; and other details regarding Respondent's position at GRI. (*See* Ex. 1.) Respondent and GRI separately memorialized Respondent's designation as an exempt Outside Sales Employee when the parties executed the Compensation Plan. (Ex. 2, GRI000011, § I(b).)

The Compensation Plan detailed the nature of Respondent's role with GRI, including the classification of Respondent as an Outside Sales Employee. The Compensation Plan defines an Outside Sales Employee in accordance with Section 13(a)(1) of the Fair Labor Standards Act. (Ex. 2, at GRI000023.) Respondent was classified this way because as a Vice President of Mortgage Lending, GRI expected Respondent to "regularly and frequently visit with client and prospective clients, referral partners and potential referral partners in person to discuss the services that [GRI] offer[s], explain loan options, procedures, costs/benefits, etc." (Ex. 2, GRI000011, § I(b).) GRI also expected that "[t]hese meetings will normally and customarily occur outside of the office." (*Id.*) This meant that GRI would not be dictating Respondent's work schedule, working hours, or how he was to perform his duties as a Vice President of Mortgage Lending at GRI. Respondent's testimony will show that he understood and shared these expectations. In event that Respondent was not meeting those shared expectations, Respondent was to "notify the Company of any such deviation." (*Id.*)

The evidence will show that Respondent was fully aware of this classification as an outside salesperson, and that he agreed to notify GRI if he was not meeting the stated requirements for that role. Respondent never notified GRI that he was not fulfilling his anticipated job duties. In fact, Respondent earned a substantial amount in commissions, indicating that he understood and was performing his role as an outside salesperson at GRI. Specifically, the evidence will show that Respondent spent the majority of his working hours performing sales activities to sell GRI's mortgage loan products and did so exclusively outside of any GRI offices.

Respondent, as well as Respondent's managers will also testify that Respondent performed his sales duties without interference from anyone at GRI. No one at GRI ever tracked Respondent's hours worked or his sales activities, much less required him to fill out a timesheet. Instead,

Respondent's own testimony will show, that as an outside salesperson, he worked without day-to-day supervision, and it was entirely within his own discretion to set a work schedule that enabled him to meet his (and GRI's) goals for Respondent's role as a Vice President of Mortgage Lending. The evidence will show that Respondent was properly classified under both state and federal law as an outside salesperson based on both the plain language of his employment contracts and Respondent's execution of that role.

## GUARANTEED RATE, INC.'S BREACH OF CONTRACT CLAIM

To prevail on its cause of action for breach of contract, GRI must prove: (1) the contract's existence, (2) [GRI's] performance or excuse for nonperformance, (3) breach, and (4) damages. *Careau & Co. v. Security Pac. Bus. Credit., Inc.* (1990) 222 Cal.App.3d 1371, 1388. Respondent failed to perform under the express terms of the Retention Bonus Addendum. Respondent refuses to repay the amounts due under the Retention Bonus Addendum after he chose to resign prior to completing the two continuous years of employment required to earn the Retention Bonus he was advanced. As a result, GRI suffered harm and is entitled to damages.

### A. Respondent Breached the Retention Bonus Addendum.

There is no dispute as to the existence and validity of the Retention Bonus Addendum. GRI's sole obligation under the Retention Bonus Addendum was to advance the Retention Bonus. GRI fulfilled this obligation when it advanced the $125,000.00 on April 15, 2022. (Ex. 4.) There is also no dispute that Respondent has refused to repay any portion of the Sign-On Bonus he was advanced after he voluntarily resigned from GRI.

Respondent breached the Retention Bonus Addendum when he failed to perform his obligations that agreement. After he resigned from GRI on September 15, 2023—prior to completing two years of continuous employment from the Effective Date of the Retention Bonus

Addendum—Respondent was obligated to repay the unearned Retention Bonus to GRI within 10 days of his resignation. Witness testimony at the hearing in this Arbitration will reflect that Respondent failed to do so. Respondent's failure to repay the amount advanced to him constitutes a breach of the Retention Bonus Addendum. *See Walgreen Co. v. Anest*, No. C097574, 2023 Cal. App. Unpub. LEXIS 4267, at *22-23 (July 24, 2023) (affirming summary judgment in favor of plaintiff on plaintiff's breach of contract action, holding that defendant, a former employee of plaintiff, breached her employment agreement with plaintiff under which plaintiff provided her with a $35,000 hiring incentive payment on the condition she remain continuously employed by plaintiff for three years, when defendant failed to repay the incentive payment after resigning in less than three years); *see also Cmg Mortg. v. Enriquez*, 2022 Cal. Super. LEXIS 25474, *2-3 and *Cmg Mortg. v. McDonald*, 2022 Cal. Super. LEXIS 25400, *3 (both finding that respective defendants, former employees with plaintiff mortgage loan origination company who each accepted a $20,720 sign-on bonus from plaintiff under the condition they would remain continuously employed by plaintiff for 12 months, breached their contracts with plaintiff when they failed to repay their incentive payments after resigning before 12 months). The governing case law supports an award in GRI's favor on its claim for breach of contract against Respondent, and the evidence at the hearing will establish that GRI has proved all elements of that claim.

**B. GRI Should Recover Attorneys' Fees and Arbitration Costs.**

GRI is entitled to recover its attorneys' fees and costs incurred in this case under the terms of the Compensation Plan and Retention Bonus Addendum. Under the Compensation Plan, Respondent agreed that GRI "may recover from you its attorneys' fees and costs relating to any action to enforce, defend and/or prosecute this Agreement." (Ex. 2 at GRI000020, IX.) By virtue of the scope of the Retention Bonus Addendum, GRI's right to recover its attorneys' fees and costs

relating to enforcing the rights of the Compensation Plan and Retention Bonus Addendum are applicable to this action. (*See* Ex. 3, integrating the right to recover costs and fees provisions of the Compensation Plan, "All of the terms and conditions of the original Agreement, including any and all subsequent amendments, shall be in full force and effect unless amended and modified by this Addendum.") GRI seeks to recover these amounts, in addition to the damages from Respondent's breach of contract.

## RESPONDENT'S COUNTERCLAIMS

### A. GRI Did Not Breach Any Contracts with Respondent.

Respondent's First Counterclaim for breach of contract alleges that Breaux did not receive all the compensation to which he was entitled under the Compensation Plan. As his basis for this counterclaim, Respondent entirely relies on a misunderstanding of the Compensation Plan and its corresponding addenda that dictates Respondent's commissions during his GRI tenure. Specifically, Respondent relies upon a table explicitly titled "Example" contained in the Compensation Plan to support his allegations. (Ex. 2, at GRI000009-GRI000010.) In his counterclaim, Respondent improperly transforms this table into a guarantee of compensation he would receive if he reached a specific projected loan volume. The table, as testimony at the hearing will show, is a representation of Respondent's potential compensation, as well as the employment benefits that he would receive at GRI.

**Your Estimated Total Compensation For Your First Year of Employment With The Company**

| | | |
|---|---|---|
| Sign-On Bonus | | $147,000 |
| Signing Bonus Commission (estimated) | | $390,000 |
| Scorecard Bonus Commission (estimated) | | $100,000 |
| Marketing Platform | | $25,725 |
| Business Development | | $32,000 |
| Processing Support (estimated) | | $37,000 |
| Health Insurance & Other Benefits (estimated) | | $8,000 |
| **"Enhanced Value"** | | **$739,725** |
| Base Commissions | 78 Basis Points | $780,000 |
| **Total Compensation** | **151 Basis Points** | **$1,519,725** |

(Ex. 2, at GRI000010.)

Respondent alleges that GRI breached the Compensation Plan by paying Respondent $996,738.44 in his first twelve months of employment at GRI, not the $1,519,725.00 quoted in the "Example" table in the Compensation Plan. Anything more than a cursory review of the subject table, however, shows that its purpose was to provide Respondent with a visual representation of both the monetary benefits he would receive (such as commissions) and the human resources benefits he would receive (such as health insurance and business development support). Further, the monetary categories within the table are all clearly labeled as "estimated" values based on his projected loan volume. (*See* Ex. 2, at GRI000006 – GRI000009). Indeed, Respondent himself acknowledges that these values were "projected" and not guaranteed in his Counterclaim. (Counterclaim, ¶ 34.)

Respondent has not, and cannot, offer any basis for arguing that he is entitled to any amount of compensation based on this portion of the Compensation Plan. Instead, the evidence will show that Respondent has received the full amount of compensation to which he was entitled under the

terms of both his initial Compensation Plan and his numerous addenda. GRI will show that Respondent was paid commissions in accordance with the Compensation Plan, specifically the section of the Compensation Plan titled "Your Commissions." (Ex. 2, at GRI000006 – GRI000007.) Further, the evidence will show that Respondent changed the amount of commissions to which he was entitled multiple times throughout his tenure at GRI. (*See, e.g.*, Sales Compensation Plan – Addendum 3; Sales Compensation Plan – Addendum 5, attached hereto as Exhibit 6 and Exhibit 7, respectively.) Those changes resulted, which the evidence will show were made at Respondent's request, altered the total compensation Respondent received from what the "estimated" amounts in the above table contemplated. The evidence will also show that GRI paid Respondent in accordance with each of the documented changes to his commissions and never underpaid Respondent for loans he originated.

GRI did not breach of the Compensation Plan because GRI, at all times, paid Breaux in accordance with the explicit terms of the Compensation Plan and accompanying addenda. Therefore, Respondent suffered no damages. The evidence will also show that, while he was employed at GRI, Respondent never informed GRI that he believed he was improperly compensated. Respondent only raised these allegations after GRI brought this arbitration against him. Respondent's First Counterclaim improperly rewrites the Compensation Plan and accompanying addenda in a manner that is a fundamentally unreasonable interpretation of the plain language of the contracts at issue here.

**B. GRI Did Not Breach the Implied Covenant of Good Faith and Fair Dealing.**

Respondent's Second Counterclaim is premised on the same misreading of the Compensation Plan's terms. In California, "the implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligations." *Avidity Partners, LLC v. State*

*of Cal.*, 221 Cal. App. 4th 1180, 1204 (3rd Dist. 2013). When applicable, the covenant is used to protect the express promises of the contract. *Id.* An implied covenant may only be imposed if: (1) the implication arises from the language used or it is indispensable to effectuate the intention of the parties; (2) it appears from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) it is justified on the grounds of legal necessity; (4) it can be rightfully assumed that it would have been made if attention had been called to it; and (5) the subject is not completely covered by the contract. *Avidity Partners*, 221 Cal.App.4th 1180, 1208 (quoting *Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 804).

Respondent contends that GRI violated the covenant of good faith and fair dealing by paying Respondent $996,738.44 in his first twelve months of employment at GRI, not $1,519,725.00. As demonstrated above, Respondent's basis for this allegation is the same nonsensical interpretation of the "Example" table contained in the Compensation Plan. Nothing in the subject table guarantees Respondent a specific amount of compensation.[1] The evidence will show that Respondent was paid properly for the commissions he earned on the loans he originated. Since there is no underlying breach of contract, for all the reasons set forth above, GRI did not breach the covenant of good faith and fair dealing.

**C. GRI Did Not Intentionally (or Otherwise) Misrepresent Any Material Facts to Respondent.**

Based on the same unreasonable reading of the Compensation Plan as outlined above, Respondent also brings a claim for fraud and misrepresentation. The elements for intentional misrepresentation are: (1) a misrepresentation; (2) knowledge of falsity of the misrepresentation; (3) intent to induce reliance; (4) actual and justifiable reliance; and (5) resulting damage. *Lazar v.*

[1] The first line of the Example table shows Respondent was entitled to a defined Sign-On Bonus in the amount of $147,000. There is no allegation from Respondent that he did not receive that specific amount, nor is that line-item at issue in this arbitration.

*Superior Court* (1996) 12 Cal.4th 631, 638. Respondent alleges that GRI misrepresented two material facts: (1) that it would pay Respondent $1,519,725.00 if he originated at least $1,000,000 in loan volume during his first year of employment; and (2) that GRI's loan products were "very competitive on the market."

As demonstrated above, a reasonable interpretation of the plain language in Respondent's Compensation Plan does not support a claim that GRI misrepresented any facts to Respondent. The portion of the Compensation Plan on which Respondent relies is the same "Example" table that is the subject of the preceding two sections. Here, as above, the subject table makes no guarantees to Respondent regarding his compensation and could not be reasonably relied upon to do so. Respondent fails to prove any element of misrepresentation regarding this supposed "fact."

Similarly, Respondent has not, and cannot, offer any evidence regarding the competitiveness (or lack thereof) of GRI's mortgage loan products. Respondent has not adduced any evidence regarding any of the following: (1) the specific products about which GRI made these alleged representations; (2) GRI's knowledge of the truth or falsity of any alleged representations; (3) the reasonableness of any reliance on the alleged representations; and (4) any damages Respondent suffered as a result of these alleged representations. The evidence will show that Respondent has failed to prove any element of his claim for fraud or misrepresentation and it should fail as a matter of law.

**D. Respondent Was Properly Classified as an Outside Salesperson, and Counterclaims Related to this Classification Necessarily Fail.**

Respondent's Fourth Counterclaim (Failure to Pay Minimum Wages); Fifth Counterclaim (Failure to Pay Overtime Wages); Sixth Counterclaim (Liquidated Damages); Seventh Counterclaim (Paid Rest Violations); Eighth Counterclaim (Failure to Timely Pay Earned Wages After Separation); and Ninth Counterclaim (Failure to Provide Accurate Itemized Pay Statements)

are premised on the unfounded allegations that GRI misclassified Respondent as an Outside Sales Employee, as defined by Section 13(a)(1) of the Fair Labor Standards Act and California Law. "'Outside salespersons' in California are exempt from statutory overtime, minimum wage, reporting time, and meal-and-rest-break requirements." *Espinoza v. Warehouse Demo Services, Inc.* (2022) 86 Cal.App.5th. The evidence will show that Respondent was correctly classified as an Outside Sales Employee.

At the outset of his employment with GRI, Respondent acknowledged and agreed that he would undertake the job duties of an outside salesperson. (*See* Ex. 1 and Ex. 2, at GRI000011, § I(b).) "'Outside salesperson' means any person, 18 years of age or over, who customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities." (8 Code of Cal. Reg. §11070(2)(J).) California courts use a quantitative approach to determine whether an employee is an Outside Sales Employee. Under this approach, an employee is correctly classified as outside sales if that employee spends over 50 percent of their time "away from an employer's place of business selling tangible or intangible items or obtaining orders for products, services or use of facilities." *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 798. Outside Sales Employees are classified as such because employers are "rarely" aware of what that employee is "doing on an hour-to-hour basis." *Espinoza* 86 Cal.App.5th at 1191.

Determining whether an employee is an "outside salesperson" depends on "how the employee actually spends his or her time," "whether the employee's practice diverges from the employer's realistic expectations," "whether there was any concrete expression of employe displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirement of the job." *Ramirez* 20 Cal.4th at 798.

The evidence presented at the arbitration will show that Respondent was properly classified as an outside salesperson, and therefore each of his claims arising from his alleged misclassification are unfounded. The evidence will show that Respondent not only spent the majority of his time working on outside sales activities, but that he successfully performed the sales activities GRI expected of him. Testimony at the hearing will confirm that Respondent worked with little interference from his managers at GRI. The evidence will show that Respondent was given autonomy to conduct his sales activities from outside of the GRI offices and was never required to spend any time at the offices (both before, during, and after the Covid-19 public health order restricting in-person meetings). Breaux's supervisors did not direct his activities, nor did they dictate when and how those activities should be carried out. Each of these factors illustrate that Breaux was, in both theory and practice, an Outside Sales Employee for GRI. *Grubb & Ellis Co. v. Spengler* (1983) 143 Cal.App.3d 890, 897.

Further, witness testimony and documentary evidence will show that Breaux was a high-performing employee who was conducting himself in accordance with the job expectations set forth by GRI. Tellingly, the evidence will show that Breaux never informed GRI that he believed he was not performing adequately as an outside salesperson; if he had believed he was not conducting the requisite outside sales activities, his Compensation plan required him to give GRI notice of that failing. (Ex. 2, at GRI000011, § I(b).)

Similarly, the evidence will show that while he was employed at GRI, Respondent never raised any concerns that he was incorrectly classified as an outside salesperson. Respondent raised his claims about improper classification for the first time in this arbitration. Respondent's role as a mortgage loan officer required him to spend the majority of his time engaged in selling mortgage loan products offered by GRI. Respondent knew the responsibilities inherent in his job as a loan

officer from the start: both his offer letter and Compensation Plan make clear that Respondent would operate as an Outside Sales Employee. (Ex. 1 and Ex. 2, at GRI000011, § I(b).) Respondent's testimony at the hearing will confirm that he understood these obligations and intended to perform accordingly.

GRI anticipates that Respondent will use the Covid-19 public health restrictions to argue that he was improperly classified as an outside salesperson. Specifically, GRI anticipates that Respondent will use the "stay-at-home" orders in 2020 and 2021 to argue either that: (1) he could not possibly have performed outside sales activities, since he was not permitted to meet people in person; or (2) his home office was temporarily converted into GRI's place of business, thereby making him a misclassified employee. Neither of these arguments holds water since the fundamental nature of Respondent's employment did not change during his tenure at GRI. Respondent's classification as an outside salesperson was based on his performance of mortgage loan sales work from outside of GRI's places of business. GRI anticipated that he would perform these functions from his home office, as well as out in the field with realtors and at industry events. Both Respondent and GRI agreed that Respondent would perform the duties of an outside salesperson. (Ex. 2, at GRI000011, § I(b).)] Nothing about the Covid-19 public health restrictions changed Respondent's underlying job, which was to originate loans.

Moreover, the relevant case law and facts of this case establish that Breaux's home office was not an extension of GRI's place of business. An employer's place of business is the "property that is 'owned or controlled by [the] employer.'" *Espinoza*, 86 Cal.App.5th 1184 (quoting *Moore v. International Cosmetics and Perfumes, Inc.* (C.D. Cal., June 24, 2016, No. ED CV 14-1179-DMG (DTBx)), 2016 WL 3556610). The evidence will show that, even during the Covid-19 pandemic, Respondent continued to perform the same functions both before and after the stay-at-

home restrictions. Respondent will testify that he continued to conduct his outside sales activities via phone and video, much as he did prior to the Covid-era restrictions. Respondent will also testify that GRI controlled no aspect of the activities Respondent undertook from his home office or controlled his schedule in any way. Further, Respondent conducted his unsupervised outside sales activities predominantly from his home office before and during the Covid restrictions were in place. Therefore, any argument Respondent makes that his home office was transformed into an extension of GRI's place of business fails, because GRI controlled no aspect of the space nor any of the work performed by Respondent from that home office.

**E. Respondent's Counterclaim for Violations of California Unfair Competition Law is Unfounded.**

Respondent's vague invocation of the California Unfair Competition Law is without merit because GRI engaged in no activities covered by this statute. As outlined above, GRI did not engage in any "unlawful, unfair or fraudulent business or practice." Cal. Bus. & Prof. Code § 17200. To the extent Respondent bases this counterclaim on unpaid commissions, the evidence will establish that GRI paid Respondent in accordance with the Compensation Plan, its accompanying addenda, and all applicable state and federal laws. To the extent Respondent bases this counterclaim on any alleged misclassification as an Outside Sales Employee, as demonstrated above, such an argument is unfounded.

Further, Respondent's counterclaim under the Unfair Competition law is illogical in several respects. For example, Respondent alleges that he "lacks an adequate remedy at law," yet seeks no equitable relief. (Counterclaim, ¶ 95.) Additionally, Respondent has, at no point, alleged that his employment contracts are not valid and enforceable. Indeed, Respondent relies on the validity of his contracts for his other nine counterclaims. Additionally, Respondent alleges that he "has been harmed including being unable to work for [GRI] without being subject to legal violations."

(Counterclaim, ¶ 96.) It is unclear what this allegation means and Respondent has adduced no evidence to support it. Overall, Respondent's counterclaim under the Unfair Competition Law is unsupported by either the facts in this case or any relevant case law and should fail.

### F. Respondent's Affirmative Defenses are Inapplicable to GRI's Claim.

Respondent asserts several defenses, all of which are unsupported by the facts and the law that governs this case. Several of Respondent's affirmative defenses rely on allegations that GRI breached its contracts with Breaux or that GRI acted in bad faith. As established above, Respondent will be unable to establish facts necessary to prove these defenses. The evidence will show that GRI at all times acted in good faith and adhered to the contracts between Respondent and GRI. For those reasons, Respondent's Sixth Affirmative Defense (Set Off Damages), Seventh Affirmative Defense (Unclean Hands), and Ninth Affirmative Defense (Claimant's Own Conduct) do not defeat GRI's claim against him for breach of contract.

Respondent similarly has adduced no facts to support his other affirmative defenses. Respondent's First Affirmative Defense (Failure to State a Claim); Second Affirmative Defense (Statute of Limitations); Third Affirmative Defense (Estoppel); Fourth Affirmative Defense (Laches); Fifth Affirmative Defense (Release and Waiver); Eighth Affirmative Defense (Fault of Others); Tenth Affirmative Defense (Failure to Mitigate Alleged Damages); Eleventh (Accord and Satisfaction); Twelfth Affirmative Defense (Uncertain and/or Speculative), and Thirteenth Affirmative Defense (Void and Unenforceable) fail due to a lack of factual support.

## CONCLUSION

For the foregoing reasons, Guaranteed Rate, Inc. respectfully requests that the Arbitrator: (1) enter an award in favor of Guaranteed Rate, Inc. and against Respondent David Breaux; (2) award Guaranteed Rate, Inc. compensatory damages in an amount in accord with the proofs, but in any event, no less than $125,000.00; (3) award Claimant Guaranteed Rate, Inc. its damages,

attorneys' fees, fees paid to the Arbitrator, filing fees and costs related to this action; and (4) any other and further relief the Arbitrator deems just and equitable.

DATED: October 14, 2025

GUARANTEED RATE, INC

*/s/ Wil LeCompte*

Hannah M. Stowe
Emma Steimel
Wil LeCompte
3940 N. Ravenswood
Chicago, IL 60613
Tel: (773) 290-0553
hannah.stowe@rate.com
emma.steimel@rate.com
wil.lecompte@rate.com

*Attorneys for Guaranteed Rate, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing was served upon the individuals identified below via email and via the JAMS Access Portal on October 14, 2025:

Tyler Paetkau
tyler@paetkaulg.com

*/s/ Wil LeCompte*
Wil LeCompte

# Exhibit 1

guaranteed Rate

Feburary 17th, 2020

**Sent via Email**
David Locke Breaux
3027 Monte Sereno
Palm Springs, CA 92264
davidbreaux@me.com
415-690-3701

Dear David,

We are delighted to offer you employment with Guaranteed Rate, Inc. (GR) and we look forward to you joining our team. We trust that your knowledge, skills, and experience will be among our most valuable assets. I thought it would be helpful to provide the details of our offer:

- **Job:** Your title will be VP of Mortgage Lending. In this capacity, you will report directly to Todd Pianin.
- **Pay:** Please refer to your Employment Agreement for further details.
- **Overtime:** This position is considered exempt. Therefore, you are not eligible to receive overtime.
- **Start:** Your starting date will be February 17th, 2020 at 9:00am. On that date, please report to your work location: 1808 Aston Ave Ste 200, Carlsbad, CA 92008.
- **Benefits:** You will receive GR's standard benefit package that will be contained in a separate GR benefits guide. The provisions of the guide supersede all terms of this letter and may be altered by GR from time to time. You will be offered a comprehensive benefits package for you and your dependents, if any, including…
  - medical
  - dental
  - vision
  - life
  - short- and long-term disability
  - critical care
  - legal assistance
  - flexible spending plans (medical, dependent, transit and parking).

  A brief summary of these benefits is attached. You become eligible for these benefits on the first of the month following 30 days of employment. Approximately 2 weeks beforehand, you will receive detailed information along with instructions for enrolling.
- **401(k):** You are eligible to participate in our 401(k) plan on the first of the month after celebrating your first 90 days of employment. You will be automatically enrolled at 4%, but you always have the option of changing your deferral or opting out of the plan entirely.

DS
DB

guaranteed Rate

Although we are sure this will not be an issue, this offer of employment is contingent on the information we receive through the authorized background check, and our satisfactory completion of proof of your authorization to work in the United States. If you commence work before GRI has completed its inquiry, you will be deemed to be a conditional employee.

Additionally, we hope that your employment with us is mutually satisfactory. Employment at Guaranteed Rate is "at will". This means that you may resign from GR at any time and GR has the right to terminate this employment relationship with or without cause at any time. Neither this letter nor any other communication, either written or oral, should be construed as a contract or employment for a term.

Finally, GR hopes that you accept this offer of employment. This offer letter supersedes any and all prior oral or written communications between GR and you. We welcome you as an employee and look forward to a successful relationship in which you will find your work both challenging and rewarding. If you have any questions, please feel free to call me at 949-359-4241.

Sincerely,

Karla Cruz

Karla Cruz
HR Business Partner

**Agreement:** To accept this offer, kindly sign your name below to signify your understanding and acceptance of the terms contained in this letter. So that we may expedite your onboarding process, please sign via DocuSign within the next 2 business days.

**ACCEPTED ON** 02/17/2020 ______________________, **2019** DocuSigned by: David Breaux 518B8F80D5B9484... ______________________**(Signature)**

# Exhibit 2

# Compensation Terms

Vice President of Mortgage Lending While Using Temporary Authority

Exclusively Prepared For

DAVID BREAUX

guaranteed Rate | The Platform to Double Your Purchase Business

## Guaranteed Rate Core Values

Here at Guaranteed Rate we strive for the industry leading value proposition for our loan officers, our referral sources and our customers.

**Put the customer first**

At Guaranteed Rate a satisfied customer is one who would refer us to friends and family. We strive to win the trust and the business of our customer to make them clients for life.

**Work with the best of the best**

We built our company by focusing on the best of the best. High performing individuals and organizations have a multiplying effect on results and so we are selective about whom we work with. We work hard to support and improve the relationships we have with our employees and referral partners.

**Demand excellence**

We have a high standard for the quality of our work. When we do our jobs well, our referral partners are happy and our customers keep coming back. We pride ourselves on excellent work and it shows in our year over year growth.

**Hold self and others accountable**

We hold ourselves and others accountable for high quality work meeting commitments made. We admit our mistakes, seek transparency and embrace constructive feedback, which allows us to learn from our mistakes and improve in the future.

**Ownership**

We work as though we own the company and we focus on the whole. We have a commitment to sustainability and growth.

**Frugality**

We spend on what matters to our customers and we limit the rest. Low rates can only be accomplished through being financially disciplined. Frugality is a constraint that forces us to be inventive and have a culture of self-sufficiency.

**Bias to action**

Quick delivery is important for our customers and our bottom line. We move fast in order to limit risk. We make tough decisions and strive to create an environment that fosters a strong bias to action.

**Healthy, balanced and fun**

Delivering results is best achieved by energetic and healthy individuals who love their jobs, have good relationships with co-workers and live balanced lives. We also believe that part of being a healthy and balanced individual is giving back and making a difference outside the company through charity.

**Think big and solve problems**

We are bold in our ideas and we challenge the status quo. When confronted with a problem we turn lemons into lemonade, finding solutions with a proactive mentality.

**Deliver results**

We overcome obstacles, solve problems and produce results for the business. We don't spend time thinking about the past, rather, we own them and find ways to deliver better outcomes in the future.

---

**The following document contains specific details related to your compensation structure.**

Please reach out to me with any questions.

James Elliot

(310) 806-4604

James.elliot@rate.com

# COMPENSATION, CORPORATE OBJECTIVE AND LOAN PRICING SCHEDULE FOR DAVID BREAUX

This Compensation, Corporate Objective and Loan Pricing Schedule ("Schedule") to the Sales Compensation Plan and Agreement (the "Agreement") is dated as of **February 17, 2020.** This Agreement shall become effective on the date you are issued a license to conduct business as a mortgage loan originator in one of jurisdictions in which the Company is licensed to do business (the "Effective Date").

The purpose of this Schedule is to identify and confirm your Corporate Objective, loan pricing, Commissions and other compensation on and after the Effective Date.

Compensation under this Agreement shall at all times comply with applicable law, including the Loan Originator Compensation Rule, 12 CFR § 1026.36(d)-(e). Nothing in this Agreement shall be construed to conflict with applicable law.

All capitalized terms that are not defined in this Schedule shall have the meaning set forth in the Agreement.

You and the Company agree as follows:

## 1. YOUR ABILITY TO ORIGINATE LOANS USING TEMPORARY AUTHORITY

Temporary Authority shall begin on the date in which you complete a task list of items required by the Company to sponsor your license for Temporary Authority. This date will be different than the effective date of this agreement. While you are completing your task list of items you may not conduct any licensed activity which includes but is not limited to the following: quoting rates or offering mortgage terms to prospective borrowers, discussing eligibility or suitability of particular loan programs, discussing credit qualifications scenarios, issuing pre-approval letters, taking loan applications or otherwise completing 1003s, pulling credit or locking a loan or marketing or holding yourself out as an individual who can do any of the above. The task list of items you need to complete before the Company will sponsor your license for Temporary Authority is listed below.

1) a complete/submitted application for licensure in NMLS;
2) full explanation and supporting documentation uploads for any "Yes" answer to a disclosure question;
3) a criminal history record information check from the FBI;
4) authorization for a credit report to be obtained;
5) state-specific documents required as part of an MLO license application; and
6) license sponsorship by Guaranteed Rate, Inc.

After the submission of the task list of items, you will be expected to fully complete all additional licensing requirements within **45 days of your application**, which may include, but is not limited to, a passing score on the SAFE Mortgage Loan Originator Test **–** National Component with Uniform State Content and completion of all required licensing education. In the event these items are not fully satisfied within the 45 days, Guaranteed Rate, Inc. may, at its own discretion, remove sponsorship of the pending license application thereby ending the Temporary Authority status.

You acknowledge and understand that you will not be given Temporary Authority if you have had any of the following occur:

1) had a mortgage loan originator license application denied or a mortgage loan originator license revoked or suspended in any jurisdiction;
2) been the subject to or served with a cease and desist order; or
3) been convicted of a misdemeanor or felony that would preclude licensure under the law of the application state.

## 2. YOUR PRODUCTION GOALS

| Time Periods | Dollar Volumes of Funded Eligible Loans | Number of Funded Eligible Loans |
|---|---|---|
| **The First 180 Days of Your Employment With The Company** | $50,000,000 | 55 Eligible Loans |
| **Each Year** | $100,000,000 | 110 Eligible Loans |

### 3. YOUR DRAW

You will not receive a Draw.

### 4. YOUR CORPORATE OBJECTIVE AND LOAN PRICING

| Corporate Objective | Minimum Lock Price For Eligible Loans |
|---|---|
| 130 Basis Points | 101.3 |

**Executive Management must approve any change to your Corporate Objective. In no event may your Corporate Objective be changed more than once every 90 days.**

Please see Section II(a) through (c) of the Agreement for more information about your Corporate Objective and Section II(d) for more information about loan pricing.

### 5. YOUR COMMISSIONS

#### (a) Amount of Your Base Commission

Your Base Commission for each Eligible Loan that you originate and that the Company funds during a calendar month are described in the Table below.

| Base Commission, Commission Floor and Commission Ceiling | Amount of Your Base Commission |
|---|---|
| Base Commission | 78 Basis Points × the principal balance of each Eligible Loan |
| Base Commission "Floor" | Your Base Commission will never be less than $900[1] |
| Base Commission "Ceiling" | Your Base Commission will never be more than $7,500[2] |

1. The Base Commission Floor will apply to all Eligible Loans with principal balance less than **$115,384.62**.
2. The Base Commission Ceiling will apply to all Eligible Loans that (a) have a principal balance of **$961,538.46** or more, and (b) provide a net revenue to the Company (before my commission) of **$12,500**.

#### (b) Commission on Brokered Loans

An eligible brokered loan meets the following criteria: (1) you have exhausted all available loan products that the Company offers to the customers because those products do not meet the needs of your customer; (2) you have not improperly steered the consumer to any particular loan product; and (3) the loan has been submitted and approved through the brokered loan submission process ("Eligible Brokered Loan").

Brokered loan payouts for California subject properties will receive 50% of the revenue that the Company receives on the loan, not to exceed seventy-five Basis Points (75). The Company agrees to pay you a commission of **fifty Basis Points (50)** on each Eligible Brokered Loan that you originate and the Company funds for subject properties outside the state of California. You will receive commission consistent with the Company's funded date, not the date that the loan was funded by the brokered third party. You will not be paid on any loan that does not meet the definition of an Eligible Brokered Loan.

#### (c) Amount of Your Signing Bonus Commission

The Company will pay you one of the following Signing Bonus Commissions for each Eligible Loan that you originate and that the Company funds for a limited time. The amount of Basis Points you will receive and the length of time you are eligible to receive these additional Basis Points is described in the table below.

| Term of Your Employment With The Company | Signing Bonus Commission | + | Base Commission | = | Total |
|---|---|---|---|---|---|
| 1st 390 Days[1] | **39 Basis Points** | + | 78 Basis Points | = | **117 Basis Points[2]** |
| Day 391 to Day 720[1] | **26 Basis Points** | + | 78 Basis Points | = | **104 Basis Points[3]** |
| After 1st 720 Days | 0 Basis Points | + | 78 Basis Points | = | 78 Basis Points |

1. If your start date is between the first and the fifteenth of the month, your end dates will fall on the 15th of the month. If you start date is between the 16th and the end of the month, your end dates will fall on the end of the month.
2. The Base Commission Ceiling is **$11,250** and will apply to all Eligible Loans that (a) have a principal balance of **$961,538.46** or more, and (b) provide a net revenue to the Company (before my commission) of **$12,500**.
3. The Base Commission Ceiling is **$10,000** and will apply to all Eligible Loans that (a) have a principal balance of **$961,538.46** or more, and (b) provide a net revenue to the Company (before my commission) of **$12,500**.

There is no dollar limit to the amount of the Signing Bonus Commissions that you can earn, because the amount of these Commissions is based on the dollar volume of Eligible Loans that you originate during this time period.

****Any change to your Corporate Objective during the Signing Bonus period must be reviewed by Executive Management and such change may affect your Signing Bonus****

**(d) Amount of Your Scorecard Bonus** **Annual Value of $100,000**
(Based on projected volume of $100 million x 10 bps)

The potential amount of your Scorecard Bonus is described in a separate "Retail Sales Performance Scorecard," which will be provided to you as a separate document.

You can earn **up to 10 additional basis points** on each Eligible Loan originated by you and funded by the Company by working efficiently. These basis point fall within a range that may change from time to time. The scorecard bonus is based on closing ratios, efficient application submissions, fee collections, minimizing rush requests, minimizing errors and submitting clean/high quality files to underwriting. The scorecard bonus also rewards submitting clean files that can be processed and closed quickly.

**(e) Your Signing Bonus**

The Company will advance you a Signing Bonus. The amount of the Signing Bonus and when you will receive the advance of the Signing Bonus is described in the Table below.

| Bonus Amount | When We Pay the Bonus to You |
|---|---|
| **$73,500** | Advanced on the **March 31, 2020** payroll date, but not earned until the 731st day of employment with the Company. |
| **$73,500** | Advanced on the **April 30, 2020** payroll date, but not earned until the 731st day of employment with the Company. |
| **$147,000** | --- |

The Company agrees to advance you a conditional signing bonus of one hundred forty-seven thousand dollars ($147,000) subject to all required taxes and withholdings ("Signing Bonus"), payable on your second and fourth eligible payroll dates, as described in the table above. The Signing Bonus is contingent upon your continued employment with the Company for a period of two years (2) following the Effective Date. You agree that the Signing Bonus shall not be deemed earned until such time that you have complete two years (2) of continuous employment with the Company following the Effective Date. If, prior to the two year (2) anniversary of the Effective Date, you resign or your employment is terminated by the Company for cause, you agree to repay the Company the net amount of the Signing Bonus within 10 days of such termination of employment and you agree not to seek a refund or credit for any amounts paid by the Company on your behalf for state and federal taxes.

You agree that any repayment due to the Company of the Signing Bonus may be deducted to the extent permitted by law from any amounts due to you at the time of employment termination, including for wages, accrued vacation pay bonuses and commissions, and hereby expressly authorize the Company to make such deductions.

***Please see Section IV(d) of the Agreement for more information about your bonus.***

**6. MARKETING PLATFORM – ALL INCLUSIVE PLAN**
**Annual Value of $25,725**

You have elected to receive the All-Inclusive Plan. This Plan provides you with a suite of tools, resources and materials to support your business.

| Plan Highlights (Standard) | ANNUAL VALUE ADD: $15,000 |
|---|---|
| • Monthly Postcard Mailers (500 per month x 11 months x $0.65) | ($3,575) |
| • Additional Postcard Mailers (1500 per month x 11 months x $0.65) | ($10,725) |
| • Regional Marketing Manager | ($2,500) |
| • Event Planners | ($2,500) |
| • Social Media Team | ($2,500) |
| • Email Blast Mailing ($83/month x 12) | ($1,000) |
| • Value Added Marketing Services for Realtors | ($1,000) |
| • Marketing Kit/Custom Realtor Partner Material | ($1,000) |
| • Moving Announcement Postcards (500 names) | ($375) |
| • Personal GRI Website | ($300) |
| • Guaranteed Rate Report Weekly eNewsletter | ($65) |
| • VP Brochure | ($65) |
| • Personalized Weekly Market Update | ($65) |
| • Realtor Partner Program Binder Presentation | ($30) |
| • Bio Sheet | ($25) |

**7. BUSINESS DEVELOPMENT ALLOWANCE**
**Annual Value of $32,000**

This benefit will allow you to grow your business, expand your realtor relationships, plan events and much more.

- Based on your expected annual volume numbers, you will be given a quarterly business development allowance of two Basis Points (2) multiplied by your quarterly Eligible Loan Volume. This can be used for events pre-approved by the Company. A complete list of all approved marketing and business development expenses can be found on the Company's intranet. Any unused portion of this allowance will not roll over into the next quarter.
- The Company agrees to pay for the use of the Company's business development specialist for six months (6), at the platinum level. This is a cost to the Company of two thousand dollars ($2,000). After your initial six months (6), you are eligible to participate in the program at a cost to you of two thousand dollars ($2,000). If you choose to participate in the program after your initial six months (6), a separate addendum will be provided to you.
- All marketing and events must comply with all federal, state and local laws to be eligible for reimbursement. All marketing and events expenses must be submitted for reimbursement on the Company's expense report software within thirty days (30) of incurring the expense to be eligible for reimbursement.

**8. PROCESSING SUPPORT**
**Annual Value of $37,000**

**Mortgage Consultant/Loan Coordinators:** Guaranteed Rate will cover your cost of an MC and LC.

- Based on your expected number of annual Eligible Loans this is an additional value of **$22,000 per year** ($200/Eligible Loan x 110 Loans)
- The Mortgage Consultant transitions the loan from the point of sale by the VP to the processing of the application through underwriting. Additionally, the MC has good product knowledge and serves as a resource to back-up and complement the VP.

**Sales Assistant ("SA")**: The Company will cover the cost of your Sales Assistant based upon certain volume requirements per the table below:

- You agree that you are responsible for knowing and understanding the terms of the sales assistant compensation plan and agree that you will report any discrepancies to the Company's payroll and commission departments. You agree that if you fail to do this and it results in a loss to the Company that you will reimburse the Company for the full amount of the loss.

- **The Company agrees to cover the cost of your sales assistant for up to five thousand dollars ($5,000) per month for the first ninety days (90) of your employment with the Company**. **This is an additional value of fifteen thousand dollars ($15,000).** The Company will start calculating the first ninety days (90) of salary when you select, and the Company hires your sales assistant.

- The Company, at its sole discretion, may terminate or amend the sales assistant credit upon 30 days written notice to you.

| Average Funded Eligible Loan Volume for the Previous Three Months | Average Number of Funded Eligible Loans for the Previous Three Months | Monthly Credit Provided by the Company to Cover the Cost of Sales Assistant |
|---|---|---|
| $1,000,000 to $1,666,666 | 4-7 Loans | $1,750 |
| $1,666,667 to $2,499,999 | 8-10 Loans | $2,500 |
| $2,500,000 to $4,166,666 | 11-17 Loans | $3,000 |
| $4,166,667 to $6,249,999 | 18-25 Loans | $3,500 |
| $6,250,000 to $8,333,332[1] | 26 Loans or More | $4,000 |

1. For every additional $1,666,666 in Monthly Funded Eligible Loan Volume you are eligible to receive an additional $1,000 in salary credit.

**9. BENEFITS**

In addition to your Commissions, Bonuses, and All-Inclusive Plan, the Company makes the following additional benefits available to you.

- From time to time, the Company offers its employees certain group health, life, accident and disability insurance or payment plans and similar benefits. Depending on the size of your family and the benefits you select, the Company may contribute **up to $6,000 per year** to your benefits.

- You will be eligible to participate in the Company's comprehensive 401(k) program that includes a **Company match of up to $2,000** per year.

**10. EXAMPLE**

The following example is based on the assumption that you will originate 55 funded Eligible Loans during your first 180 days of employment with the Company, and 110 funded Eligible Loans during your first year of employment with the Company.

**Your Estimated Total Compensation For Your First Year of Employment With The Company**

| | | |
|---|---|---|
| Sign-On Bonus | | $147,000 |
| Signing Bonus Commission (estimated) | | $390,000 |
| Scorecard Bonus Commission (estimated) | | $100,000 |
| Marketing Platform | | $25,725 |
| Business Development | | $32,000 |
| Processing Support (estimated) | | $37,000 |
| Health Insurance & Other Benefits (estimated) | | $8,000 |
| **"Enhanced Value"** | | **$739,725** |
| Base Commissions | 78 Basis Points | $780,000 |
| **Total Compensation** | **151 Basis Points** | **$1,519,725** |

**I agree that this Schedule accurately reflects my understanding of the terms of my Draw, Corporate Objective, loan pricing, Commission, and Bonus. I also agree that I must originate each loan at or above my Corporate Objective (taking into account all of the factors and deductions described in the Agreement) to be eligible to earn a Commission.**

David Breaux

(Print your name here)

DocuSigned by:

337D75A795144B1...

(Place your signature here)

02/11/2020

(Date)

Guaranteed Rate, Inc.

DocuSigned by:

EB80CD55871A479...

By: Nikolaos Athanasiou, Chief Operating Officer

02/12/2020

(Date)

**RETAIL SALES COMPENSATION PLAN AND AGREEMENT – OUTSIDE SALES EMPLOYEE – ALL INCLUSIVE**

**DAVID BREAUX – VICE PRESIDENT OF BUSINESS DEVELOPMENT — CARLSBAD, CA (1175)**

All capitalized terms used in this Retail Sales Compensation Plan and Agreement (this "Agreement") have the meanings as defined in Exhibit A attached hereto and incorporated herein by reference in the Agreement.

## I. SCOPE OF EMPLOYMENT

You and the Company agree as follows:

**(a) Your Employment Obligations**

As an employee of the Company, you must comply with all of the following requirements.

a. You must perform all of your employment obligations in a manner that is ethical, fair and compliant with all Requirements.

b. You must price all loans at or above your Corporate Objective, as defined below, and comply with all Requirements when quoting and locking loan prices.

c. You must collect all loan fees and manage all loan application, processing and related services in a manner consistent with applicable Requirements throughout the loan transaction, from loan application through funding.

d. You must ensure that each applicant's loan terms and conditions are consistent with the applicable loan program, investor Requirements and all other applicable Requirements.

e. You must ensure and confirm that each loan and related documents and information are processed and conducted only through the Company's approved loan origination system, approved automated underwriting systems, and the Company's payroll and accounting systems, as applicable.

f. You must devote your full time and efforts to your employment with the Company. During your employment with the Company, you may not be employed by any other Person. You also may not provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities.

g. You may offer only the loan products and programs approved by and made available through an origination channel of the Company.

h. You must obtain and renew any and all applicable licenses, registrations and/or approvals required by a State governmental authority for each State in which you originate and/or intend to originate loans. The Company will terminate your employment if you (a) do not obtain any required license or other approval within 45 days after your date of employment, or (b) perform any services requiring a license or approval prior to obtaining such license or approval.

i. You must conduct all of your other employment services in compliance with all other Requirements.

**(b) Outside Sales Employee**

As an Outside Sales Employee, you must regularly and frequently visit with clients and prospective clients, referral partners and potential referral partners in person to discuss the services that we offer, explain loan options, procedures, costs/benefits, etc. These meetings will normally and customarily occur outside of the office. The Company is committed to helping its employee be successful with this platform—if you believe you are not able to, or do not, comply with the duties set forth herein it is your obligation to notify the Company of any such deviation.

## II. CORPORATE OBJECTIVE AND LOAN PRICING

### (a) How We Calculate the Corporate Objective

The amount of your Corporate Objective is set forth in the Schedule.

Your "Corporate Objective" is the amount of the Net Loan Revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

An "Eligible Loan" means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor in a manner that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"Deductible Expenses" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, *other than* the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

"Borrower Expenses" include all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

You may choose the amount of your Corporate Objective, subject to certain limits and conditions.

You understand and acknowledge that the deduction of the amounts above do not constitute deductions from your Commission. In the event that the deductions above are determined to be deductions from your Commission, you hereby expressly authorize the Company to deduct these costs, which are incurred directly for your benefit.

### (b) Corporate Objective Surplus

Net Loan Revenue received by the Company in excess of your Corporate Objective is referred to in this Agreement as a "Corporate Objective Surplus."

You may use a Corporate Objective Surplus to pay for Borrower Expenses. If a Corporate Objective Surplus is not sufficient to pay all Borrower Expenses, the borrower must pay the remaining Borrower Expense directly.

Any Corporate Objective Surplus remaining after paying all Deductible Expenses and any Borrower Expenses may be credited back to the borrower at closing.

You may ***not*** receive any Corporate Objective Surplus at any time, whether in the form of a Commission or otherwise. For example, you may ***not*** offset a Corporate Objective Shortfall with some or all of a Corporate Objective Surplus.

### (c) Corporate Objective Shortfall

In this Agreement, a "Corporate Objective Shortfall" means the amount of Net Loan Revenue received by the Company that falls short of your Corporate Objective with respect to a loan originated by you. You may ***not*** price a loan that will result in a Corporate Objective Shortfall unless approved in writing by an officer or employee designated by Executive Management of the Company. You understand and acknowledge that any such approval will be granted only under limited circumstances that comply with applicable Requirements.

If you price a loan that would result in a Corporate Objective Shortfall without written approval from a designated officer or employee of the Company, the Company may, in its sole discretion, refuse to close or fund that loan.

**(d) Loan Pricing**

The amount at which you must price each loan is set forth in the Schedule.

You must price each loan at an amount necessary to meet or exceed your Corporate Objective. For example, assume that your Corporate Objective is 150 basis points. When you originate a loan, you must review the investor's current rate sheet and lock-in an interest rate for the loan that will result in 150 basis points or more of Net Loan Revenue for the Company, after subtracting all Deductible Expenses and any Borrower Expenses credited back to the borrower.

## III. COMPENSATION

**(a) Your Draw**

**(1) In General**

Please refer to the Schedule to determine whether you have a Draw.

**(2) The Amount of Your Draw**

If you have a Draw, the amount of that Draw is set forth in the Schedule.

If you have a Draw, it will be paid during each full month you are employed by the Company. The Company will pay you the Draw in two equal installments on the fifteenth day and last day of each month. We will deduct from your Draw any federal, state and local payroll taxes and any health, disability, life or other benefits that you elect to receive. We will also deduct the amount of your Draw from your Commission and any other compensation described below and in the Schedule.

**(b) Fully Recoverable Draw and Non-Recoverable Draw**

Please refer to the Schedule to determine whether you have a Fully Recoverable Draw or a Non-Recoverable Draw.

**(1) Fully Recoverable Draw.**

If your Draw is a Fully Recoverable Draw and is greater than the amount of your Commission during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Fully Recoverable Draw Amount will be deducted from any future Commission and any other compensation earned by you. By entering into this Agreement, you hereby expressly authorize the Company to deduct any Fully Recoverable Draw Amounts and any other amounts that you owe to the Company from all future Commission and any other compensation until all Fully Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Fully Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment.

**(2) Non-Recoverable Draw**

If your Draw is a Non-Recoverable Draw and is greater than the amount of your Commission during any calendar month, you will not be required to repay the difference back to the Company. This difference is referred to in this Agreement as the "Non-Recoverable Draw Amount." The Company will not deduct any Non-Recoverable Draw Amount from any of your future Commissions or other future compensation.

**(c) Your Commissions**

**(1) How We Calculate Your Commissions**

Your Base Commission is based on a fixed percentage of the principal amount of each Eligible Loan that you originate, and is calculated in the specific manner described in the Schedule.

Please refer to the Schedule for a description of other Commissions that we will pay to you.

**(2) Commission for Loans that you assist the Company to Close**

You will receive one hundred dollars ($100) per loan for any loan that you assist the Company to close because the initial loan originator has left the employment of the Company. Any loan that you assist in this manner will not be considered an Eligible Loan and will not be included in your Eligible Loan Volume as an eligibility requirement for President's Club, Production Bonuses or any other incentive in which Eligible Loan Volume is used as a measure.

**(3) Timing of Your Commission; Advances**

Your Commission for each Eligible Loan will be calculated and advanced each month during the payroll period following the funding of the Eligible Loan in accordance with the Company's payroll practices. Your commission on each Eligible Loan that you originate and the Company funds is an advance and not earned until the Company has determined that a Recapture Event has not occurred in connection with the Eligible Loan. The Recapture Event period expires 180 days after the sale of the Eligible Loan by the Company on the secondary market, at which point your commission will be deemed earned ("Earned Commissions").

**(4) Recapture Event**

A loan has a "Recapture Event" if (i) the Company determines that your Commission or other compensation is greater than the correct amount owed under this Agreement, or there are any Fully Recoverable Draw Amounts, Recoverable Draw Amounts subject to Minimum Wage, or other negative balances or other amounts that you owe the Company under this Agreement, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (v) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed by the Company to a borrower. A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the Borrower.

If a Recapture Event occurs for a loan before the Company has paid you the related Commission, the Company will not pay you part or all of the Commission, as the case may be.

If the Company has paid you a Commission for a loan you originated prior to the occurrence of a Recapture Event, you must repay all or part of the Commission, as the case may be, to the Company immediately. If you do not repay these amounts, the Company will deduct these amounts from your future Commission or other future compensation. If you owe any of these amounts to the Company after your employment with the Company ends, you must pay all such amounts within ten calendar days after the last day of your employment.

**(5) Monthly Commission Statement Must Be Accurate**

You must ensure that each of your monthly Commission statements are accurate by reviewing all of these Commission statements online approximately one week prior to each payroll date. You must submit any questions or concerns to the Commissions Department before the applicable pay date. The Company will deny any change submitted more than 15 days after any of your Commission statements is issued

## IV. ENDING YOUR EMPLOYMENT WITH THE COMPANY

**(a) You Are an Employee "At Will"**

Your employment with the Company is "at-will." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. See Section IV(c) below for information about the Company's payment of any Commission after your employment with the Company has ended.

**(b) Termination for Cause**

The Company may also terminate your employment for Cause if: (i) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (ii) you violate Company policies, procedures or directives, (iii) you fail to comply with the terms of this Agreement, (iv) you fail to perform duties reasonably requested by the Company and/or exhibit poor performance, (v) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, (vi) you take an action or fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry, (vii) you violate a federal or state law or regulation applicable to the business of the Company, (viii) you engage in fraudulent acts, (ix) you misappropriate property belonging to the Company; or (x) you breach in any material respect of the terms of any confidentiality or proprietary information agreement with the Company.

**(c) Commissions Paid After Your Employment Ends**

After your employment with the Company ends for any reason other than for "Cause," you will receive all earned Commissions for each Eligible Loan that was originated by you and was funded within 30 calendar days after your last day of employment, unless otherwise provided in this Agreement. You will not be paid any Commission for any loan that funds more than 30 calendar days after your last day of employment.

If the Company terminates your employment for "Cause," the Company will pay to you your then-current accrued and unpaid Commissions. The Company will not pay to you any other Commission that is not accrued.

The Company may, in its sole discretion, delay the advance of your unearned Commissions for any loan up to 120 calendar days from your last day of employment with the Company.

**(d) Bonus not Paid After Your Employment Ends**

You must be employed by the Company and must otherwise satisfy all applicable conditions to be eligible to receive any bonus payments. You will not receive any bonus payment which comes due following the end of your employment with the Company.

## V. YOUR CONFIDENTIALITY OBLIGATIONS; NON-SOLICITATION

You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section V, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

**(a) Confidential Information**

During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria, and training techniques, business goals, strategic plans, promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential

aspects of the Company and its business and operations); (b) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents, materials and information belonging or relating to the Company (collectively "Confidential Information"). The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.

**(b) Use of Company's Confidential Information**

As consideration for your employment, you will not use any Confidential Information for your own benefit, or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity. You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company. However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for your actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions, (iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

**(c) Representations and Warranties/Indemnification**

You represent and warrant to the Company that neither you nor anyone acting on your behalf has: (1) taken, accepted, copied, or misappropriated any confidential, proprietary, or trade secret documents, data, or information acquired from any former employer or otherwise; (2) transmitted, communicated or divulged any confidential, proprietary or trade secret information from any former employer or otherwise to the Company or its employees; (3) used any former employer's confidential, proprietary or trade secret information in connection with your employment with the Company, including but not limited to any loan origination activity; and (4) violated any post-employment restrictive covenants or obligations you owe any former employer. You further represent and warrant that you will not engage in any of the foregoing conduct during the course of your employment with the Company.

You shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Subsection. In addition to any and all other obligations of you hereunder, you agree that you will pay the reasonable attorney's fees of the Company incurred in enforcing the obligations hereunder. The indemnification obligations hereunder shall survive the termination of this Agreement and your employment with the Company.

**(d) Non-Solicitation**

In this Agreement, "Restricted Period" means the period beginning with the first day of your employment with the Company and ending 24 months after the last day of your employment.

**(i) Employees**

During the Restricted Period, you may not, directly or indirectly, solicit or attempt to solicit, entice, recruit, influence, persuade, induce promote facilitate, encourage or assist in the solicitation of any Person

employed/engaged by the Company during your last 12 months of employment with the Company or during the remainder of the Restricted Period to end their employment/engagement with the Company and/or join you as a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship with which you become employed or affiliated, and/or During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

You may ask the Company to provide you with written consent to engage in any of the foregoing activities. The Company may approve or deny any such request in the Company's sole discretion.

**If you fail to comply with any provision of this Section V(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance**. Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement. You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section V(d), and is not a penalty. You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section V(d).

**(ii) Vendors**

During the Restricted Period, you will not, for yourself or on behalf of any other Person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of the Company, the identity of whom you learned during your employment with the Company. This provision does not apply to any such Person, the identity of whom you learned prior to your employment with the Company.

**(e) Enforcement; Remedies**

You covenant, agree and recognize that because the breach or threatened breach of the covenants, or any of them, contained in Section V hereof will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants and agreements contained in this Section V to the fullest extent allowed by law. Nothing herein shall be construed as prohibiting the Company, and its respective successors and assigns, from pursuing all legal or equitable remedies that may be available to them for any such breach, including the recovery of damages from you.

**(f) Construction**

You hereby expressly acknowledge and agree as follows:

(i) the covenants set forth in Section V are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and

(ii) each of the covenants set forth in Section V is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

In the event that any provision of this Section V shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration thereof of any such covenant, or for any other reason, such invalidity or unenforceability shall attach only to the particular aspect of such provision found invalid or unenforceable as applied and shall not affect or render invalid or unenforceable any other provision. This Section V shall be construed as if the provision or other basis on which such provisions has been determined to be overly broad had been more narrowly drafted so as not to be invalid or unenforceable.

## VI. LIMITS ON YOUR AUTHORITY

You are not authorized to (a) underwrite or approve any loan, (b) bind the Company under any agreement, lease, commitment or other obligation, (c) incur expenses on behalf of the Company, unless such expense has been expressly approved in writing by the Company. You must inform each vendor and potential vendor that you are not authorized to bind the Company.

## VII. MANDATORY ARBITRATION AND WAIVER OF RIGHT TO SUE AND RIGHT TO FILE ANY CLASS OR COLLECTIVE ACTION

**(a) Arbitration**

**Claims Subject to Arbitration**. The Company and you hereby agree that **any and all claims (legal or equitable), demands, disputes, or controversies** between you and the Company (including any employee, officer, director, shareholder, agent, contractor, or benefit plan of the Company, in their capacity as such or otherwise) arising out of, relating to, or resulting from your employment with the Company or the termination of your employment with the Company, including any breach or threatened breach of this Agreement ("employment-related disputes"), **shall be resolved by binding arbitration**. Without limiting the foregoing, the following claims must be resolved by arbitration:

(i) Claims related to your compensation with the Company brought under any federal, state or local statute, law, ordinance, regulation or order or the common law of any state, including without limitation claims relating to your wages, salary increases, bonuses, commissions, overtime pay, vacation pay, or severance pay whether or not such claim is based upon a legally protected right, whether statutory, contractual or common law;

(ii) Claims brought under any federal, state, or local statute, law, ordinance, regulation, or order, or the common law of any state, alleging that you were or are being subject to discrimination, retaliation, harassment, or denial of equal employment opportunity based on sex, race, color, religion, national origin, disability, age, marital status, or any other category protected by law; and/or relating to your benefits or working conditions, including without limitation, claims related to leaves of absence, Employee benefit plans, Employee health and safety, and activity protected by federal labor laws;

(iii) any non-statutory and/or common law claims under state or federal law, including but not limited to tort claims, contract and quasi-contract claims;

(iv) claims that arose prior to you executing this Agreement or becoming an employee of the Company (including claims that this or other agreements pertaining to your employment were fraudulently induced); and

(v) claims that arise after the termination of your employment with the Company.

**Starting the Dispute-Resolution Process**. You and the Company agree that a party who intends to seek arbitration must first send to the other, by certified mail, a written Notice of Dispute (**"Notice"**). The Notice to the Company should be addressed to: Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833 (**"Notice Address"**). The Notice must (a) provide your mailing address and phone number; (b) describe the nature and basis of the claim or dispute; and (c) set forth the specific relief sought (**"Demand"**). If you and the Company do not reach an agreement to resolve the claim within thirty (30) days after the notice is received (unless extended by mutual agreement), you or the Company may commence an arbitration proceeding with the Judicial Arbitration and Mediation Services, Inc. ("**JAMS**").

**Procedure**

(i) You and the Company agree that your employment with the Company constitutes a transaction in interstate commerce, and thus the Federal Arbitration Act (**"FAA"**) governs the interpretation and enforcement of this provision.

(ii) You and the Company further agree that any arbitration shall be administered and conducted by JAMS pursuant to the JAMS Employment Arbitration Rules and Procedures in effect as of the date either you or the Company initiates arbitration. You acknowledge that, at the time you signed this agreement, the then-applicable JAMS rules were posted on the JAMS website at www.jamsadr.com, and that you had an opportunity to review them or to request that the Company provide you with a copy of them. Notwithstanding the foregoing, to the extent that any of the JAMS Rules may conflict with this arbitration agreement, the arbitration agreement shall take precedence.

(iii) If JAMS is not available to administer an arbitration, a substitute arbitration provider shall be selected by agreement of the parties or by the court, if necessary.

(iv) All issues are for the arbitrator to decide, except that issues relating to the arbitrability of disputes, the scope and enforceability of this arbitration provision, and the interpretation and application of subsection (b) below are for the court to decide.

(v) Unless otherwise agreed by the parties, the arbitration shall be conducted in the county that was the location of your primary place of employment by the Company. The arbitration will be conducted by a single neutral arbitrator, who will be selected pursuant to the procedures set forth in the JAMS Rules.

(vi) The arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication and motions to dismiss and demurrers, prior to any arbitration hearing.

(vii) Although the arbitrator shall be bound by rulings in prior arbitrations involving you to the extent required by applicable law, the arbitrator shall not be bound by rulings in prior arbitrations involving different employees.

(viii) The parties agree that, subject to the limitations in subsection (b) below, the arbitrator shall have the power to award any remedies, including statutory and punitive damages, individualized injunctive and equitable relief, and attorneys' fees and costs, available under applicable law.

(ix) Notwithstanding the foregoing, you agree that the arbitrator shall not have the authority to disregard or refuse to enforce any lawful Company policy. The arbitrator shall issue a reasoned written decision.

**Costs of Arbitration**. The payment of the arbitration filing, administrative, hearing, and arbitrator fees shall be governed by the JAMS Rules. However, if the Company initiates a claim against you, or if you initiate a claim against the Company seeking relief valued at less than US$300,000 (by both you and the Company), excluding amounts sought for attorneys' fees and costs, the Company will pay all such arbitration filing, administrative, hearing, and arbitrator fees. If the arbitrator determines that your claim is frivolous or brought for an improper purpose (as measured by the standards of Federal Rule of Civil Procedure 11(b)), you agree to reimburse the Company for any such costs that otherwise would be your obligation to pay under the JAMS rules.

**Availability of Emergency Injunctive Relief**. If either party believes that a temporary restraining order or emergency injunctive relief is needed and an arbitrator is unable to properly resolve the merits of a dispute involving trade secrets, confidential information, intellectual property, nonsolicitation obligations, or California Labor Code § 2870, that party may petition a court for such relief. You and the Company both consent to the jurisdiction and venue of the federal and state courts located in in which you are employed or, if you work from home, in the county where the nearest Company office is located, for any such action seeking a temporary restraining order.

**(b) Waiver of Right to Sue and Right to File any Action as a Class or Collective Action**

You and the Company expressly waive any right to resolve any dispute covered by this Agreement by filing suit

in court for trial by a judge or jury.

**You and the Company hereby intend and agree that any arbitration shall be initiated and conducted only on an individual basis. Neither you nor the Company shall bring, nor shall the arbitrator preside over, any form of class, representative, or private attorney general proceeding.** In addition, unless all parties agree in writing otherwise, the arbitrator shall not consolidate or join the arbitrations of more than one employee. Further, neither you nor the Company may seek, nor may the arbitrator award, any relief that is not individualized to claimant or that affects other employees. If a court decides that applicable law precludes enforcement of any of this paragraph's limitations as to a particular claim for relief, then that claim (and only that claim) must be severed from the arbitration and may be brought in court.

**(c) Exclusions**

The mandatory arbitration provisions of this Agreement do not apply to: (i) any claim by you for workers compensation benefits or unemployment compensation benefits; (ii) any claim for injunctive or equitable relief, including without limitation claims related to unauthorized disclosure of confidential information, trade secrets or intellectual property; or (iii) any action brought relating to or arising out of any non-solicitation violations.

(d) **Voluntary Nature of Agreement**

You acknowledge and agree that ***you are waiving your right to a jury trial and any right you may have to bring any employment-related claim as a class or representative action (either in court or in arbitration) or to participate in such an action***. Finally, you acknowledge and agree that you have thirty (30) days after the date of the execution of the arbitration agreement to opt out of the agreement to arbitrate. To do so, you must mail a signed letter rejecting the arbitration agreement to Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833. The subject line must include Guaranteed Rate, Inc. The rejection notice must state that you are rejecting the arbitration provision in this agreement and provide you name, address, phone number, and e-mail address. The letter must be personally signed by you. A rejection letter is effective only if it is postmarked within thirty (30) days after the execution of this agreement, and applies only to the arbitration provision in this agreement; the rejection letter does not affect the validity or enforceability of any past or future arbitration agreements between you and the Company. You understand that you are free to opt out of this arbitration agreement if you wish; the Company will not take any adverse action or retaliate in any way against you if you choose to opt out of this arbitration provision.

## VIII. APPLICABLE LAW; VENUE

This Agreement shall be governed by and construed in accordance with the laws of the State California, without regard to the conflicts of laws provisions therein. You irrevocably consent to the exclusive jurisdiction of the state and federal courts located in the county in which you are employed or, if you work from home, in the county where the nearest Company office is located for the purposes of any action or proceeding relating to or arising out of this Agreement and/or your employment with the Company.

## IX. ATTORNEYS' FEES AND COSTS; INJUNCTIVE RELIEF

The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend and/or prosecute this Agreement. You acknowledge that a breach of any provision of this Agreement will cause irreparable harm to the Company and that monetary damages will be inadequate and may be difficult or impossible to ascertain. Therefore, in the event of any such breach, or threatened breach, in addition to all other remedies, the Company shall have the right to require you to fulfill your obligations by way of temporary and/or permanent injunctive relief.

## X. MISCELLANEOUS

This Agreement, together with any Schedule, is complete and reflects all of the agreements, representations and warranties between you and the Company and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement. The Company reserves the right to terminate or modify this Agreement at any time. Any delay or failure to enforce any provision of this Agreement by the Company shall not be considered a waiver of such provisions or any other provision of this Agreement.

This Agreement will be effective only after it has been fully executed by you and either the Company's President and CEO or the Chief Operating Officer. This Agreement may only be amended, changed or modified by a writing executed by the Company and the Employee. Notwithstanding the foregoing, the Company may change or amend any Schedule or the amount or manner in which your compensation and related matters are calculated by providing written notice to you.

To the extent a court of competent jurisdiction determines any provision is not enforceable, the parties agree that the court may modify the provision to the minimum extent necessary to make the provision enforceable. Further, any such invalid provision shall not invalidate the remaining provisions, which shall remain in full force and effect.

***I hereby acknowledge that I have reviewed the Guaranteed Rate Sales Compensation Plan. I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid. I agree to comply with and to be bound by the terms of the Plan.***

David Breaux

(Print your name here)

DocuSigned by:

337D75A795144B1...

(Place your signature here)

02/11/2020

(Date)

Guaranteed Rate, Inc.

DocuSigned by:

EB80CD55871A479...

By: Nikolaos Athanasiou, Chief Operating Officer

02/12/2020

(Date)

**EXHIBIT A**

"**Agreement**" means this Retail Sales Compensation Plan and Agreement and any Schedule hereto.

**"Authority"** means any federal, state or municipal governmental agency or regulatory authority, including, but not limited to, the Consumer Financial Protection Bureau, the U.S. Department of Justice, any State attorney general, and any state financial services or consumer protection regulatory authority.

**"Basis Point"** means a unit of measure equal to one hundredth of one percent. One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

**"Borrower Expenses"** mean all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

**"Cause"** has the meaning set forth in Section IV(b).

**"Commission"** means the amount of your variable compensation earned from your loan origination activities and identified as commissions in this Agreement and in the Schedule.

**"Company"** means Guaranteed Rate, Inc.

**"Confidential Information"** has the meaning set forth in Section V(a).

**"Corporate Objective"** means the amount of net revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

**"Corporate Objective Shortfall"** means the amount of Net Loan Revenue that falls short of your Corporate Objective with respect to a loan originated by you.

**"Corporate Objective Surplus"** means the amount of Net Loan Revenue that exceeds your Corporate Objective with respect to an Eligible Loan originated by you.

**"Deductible Expenses**" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, *other than* the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

**"Draw"** means the non-commissioned dollar amounts that an employer pays a loan officer as an advance of a Commission.

**"Early Payment Default"** means a loan originated by you that defaults during an "Early Payment Default Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

**"Early Payoff"** means a loan originated by you that pays off in whole or in part during an "Early Prepayment Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

**"Earned Commission"** has the meaning set forth in Section III (c) (2).

**"Eligible Loan"** means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor at a price that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"**Fully Recoverable Draw**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

“**Fully Recoverable Draw Amount”** means the dollar amount by which your monthly Draw exceeds your Commission during any month, which amount may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

“**Manager**” means your direct supervisor.

**“Net Loan Revenue”** means the net revenue received by the Company in connection with the funding and sale of an Eligible Loan.

**“Outside Sales Employee”** means an outside sales employee, as defined in Section 13(a)(1) of the Fair Labor Standards Act, who are exempt from both minimum wage and overtime pay requirements under the Fair Labor Standards Act.

**“Person”** means any natural Person, corporation, limited liability, partnership, sole proprietorship or any other entity.

**“Recapture Event”** has the meaning set forth in Section III(c)(3) of this Agreement.

**“Recoverable Draw Subject to Minimum Wage”** has the meaning set forth in Section III(b)(2) of this Agreement.

“**Recoverable Draw Subject to Minimum Wage Amount”** means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, in the manner described further in Section III(b)(2) of this Agreement.

**“Requirements”** means all (a) applicable laws, rules, regulations, and orders, (b) Company policies, procedures, guidelines and directives (Links to the Company’s policies and procedures can be found on the Company’s Intranet and also in the Company’s employee handbook), (c) applicable investor policies, procedures, guidelines and other requirements, and (d) terms, conditions and obligations in this Agreement.

**“Schedule”** means the Compensation, Corporate Objective and Loan Pricing Schedule to this Agreement.

**“You”** or **“your”** means you, the employee, in your capacity as a Vice President of Mortgage Lending.

***I hereby acknowledge that I have reviewed the Guaranteed Rate Sales Compensation Plan. I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid. I agree to comply with and to be bound by the terms of the Plan.***

David Breaux
(Print your name here)

DocuSigned by:
337D75A705144B1...
(Place your signature here)

02/11/2020
(Date)

Guaranteed Rate, Inc.

DocuSigned by:
EB80CD55871A479...
By: Nikolaos Athanasiou, Chief Operating Officer

02/12/2020
(Date)

**Out of State Referral Acknowledgement**

As a licensed loan officer, you are obligated to ensure that you are complying with the SAFE Act to protect your license and the Company's licenses. The Company has designed a compliant method for a VP to refer a loan to a licensed individual in states in which he or she may not be licensed. Under the program, when an unlicensed individual receives an unsolicited lead in a state in which he or she is not licensed, the referral is to be sent to the DLO Desk. Below you will find a non-exhaustive list of what you may or may not do as the Process Manager:

The Process Manager may:

- Generally describe for a borrower the loan process from a high level/educational perspective (i.e. definition of a mortgage, LE, etc.)
- Provide general explanations or descriptions in response to consumer inquiries (but nothing specifically related to the consumer's situation)
- Help in arranging the loan closing or other aspects of the loan process, provided that any communication that includes a discussion about loan terms only verifies terms already agreed to by the borrower and the DLO

The Process Manager **MAY NOT** (ONLY the licensed VP may engage in these activities):

- Discuss particular loan programs, rates, credit qualification scenarios, etc. (e.g. state, "The best product for you would be a 7/1 ARM," "I think I could lock your rate at 4.65%," "I don't think you qualify for that bond program," etc.)
- Issue pre-approval letters, even if in the name of the licensed individual
- Complete, or assist directly or indirectly in taking, an applicant's 1003
- Run credit or lock the loan
- Discuss credit scores needed to qualify or other financial information related to a borrower's ability to qualify
- Discuss loan options or present a loan summary
- Solicit loan applications in states in which you're not licensed

By signing below, you acknowledge that if the Company determines you have engaged in unlicensed activity, it revokes your ability to refer loans in the future, or take other disciplinary action, up to and including termination as it deems appropriate. Furthermore, you will not be eligible to receive compensation for any referred transaction when unlicensed activity is identified. Lastly, your signature below confirms your complete understanding of the requirements around the SAFE Act and what constitutes licensable activity.

Signed: DocuSigned by: [signature] 337D75A795144B1...

Date: 02/11/2020

# Exhibit 3

guaranteedRate

# DAVID BREAUX
# SALES COMPENSATION PLAN — ADDENDUM 8

This **Addendum 8** to your Sales Compensation Plan and Agreement dated as of **February 17, 2020**, and as previously amended from time to time (collectively, your "Agreement") is effective as of **April 15, 2022** (the "Effective Date").

The purpose of this Addendum is to amend certain terms or conditions of your Agreement. Each such amendment is described below. All other terms and conditions of your Agreement will remain the same.

You and the Company agree as follows:

**1. YOUR RETENTION BONUS.**

The Company will advance you a retention bonus (the "Retention Bonus"). The amount of the Retention Bonus and when you will receive the advance of the Retention Bonus is described in the Table below.

| Retention Bonus Amount | When We Pay the Retention Bonus to You |
|---|---|
| **$125,000** | ▪ Advanced on the **April 15, 2022** payroll date, but not earned until two (2) years of continuous employment with the Company following the Effective Date of this Addendum. |

This retention bonus will be paid in accordance with the Company's applicable payroll practices and subject to all applicable taxes and withholdings. You agree that the Retention Bonus is an advance and will not be earned unless and until you have completed two (2) years of continuous employment with the Company following the Effective Date of this Addendum. If prior to such two (2) years of continuous employment with the Company, you resign or your employment is terminated by the Company for cause, you agree to repay the Company the full amount of the Retention Bonus within ten (10) days of such termination of employment. The Company may permit you to repay the net amount of the Retention Bonus received (after tax withholding) and in such case, you agree not to seek a refund or credit for any amounts paid by the Company on your behalf for state and federal taxes. You further agree that the Company may take all steps necessary from a tax reporting perspective should you repay the Retention Bonus, which may include issuing you an amended W-2.

To the extent permitted by law, you agree that if you are obligated to repay the Retention Bonus at time of employment termination, the Company may deduct all or a portion of that amount from any other amounts due to you, including wages, accrued vacation pay, bonuses and commissions, and by signing this Addendum, you hereby expressly authorize the Company to make such deductions.

**2. SCOPE OF ADDENDUM.**

All of the terms and conditions of the original Agreement, including any and all subsequent amendments, shall be in full force and effect unless amended and modified by this Addendum. This Addendum shall supersede and replace the terms of the Agreement, and any and all subsequent amendments, only to the extent specifically contemplated and so amended hereby.

David Breaux — DocuSigned by: [signature] A18E7784ED5D405...

Employee Signature

Date: 03/29/2022

Guaranteed Rate, Inc. — DocuSigned by: [signature] EB80CD55871A479...

By: Nikolaos Athanasiou, Chief Operating Officer

Date: 03/30/2022

# Exhibit 4

guaranteed Rate

| | |
|---|---|
| **Employee Name:** | David L Breaux |
| **Employee #:** | 23617 |
| **Employee Address:** | 3027 Monte Sereno<br>Palm Springs, CA 92264 |
| **Department:** | Sales - Retail |
| **Job Title:** | GRI Loan Officer |

| | |
|---|---|
| **Pay Date:** | 4/15/2022 |
| **Pay Period:** | 3/24/2022 - 4/8/2022 |
| **Deposit Advice #:** | 482736383 |
| **Pay Frequency:** | Semi-Monthly |
| **Federal Filing Status:** | Married |
| **Federal 2c/Extra Withholding:** | No/$0.00 |
| **State Filing Status:** | Married; Alt Code 01 (CA) |
| **State Exemptions:** | 0 (CA) |

| | |
|---|---|
| **Employer Name:** | Guaranteed Rate, Inc |
| **Employer Phone:** | 773-290-0505 |
| **Employer Address:** | 3940 N Ravenswood Ave<br>Chicago, IL 60613 |

| | Current 3/24/2022 - 4/8/2022 | | | YTD As of 4/8/2022 | |
|---|---|---|---|---|---|
| | **Hours/Units** | **Rate** | **Amount** | **Hours/Units** | **Amount** |
| **Earnings** | | | **$125,000.00** | | **$211,219.72** |
| Commission | | | | | $83,383.13 |
| Scorecard Bonus | | | | | $2,836.59 |
| Retention Bonus | | | $125,000.00 | | $125,000.00 |
| **Pre-Tax Deductions** | | | **$7,500.00** | | **$17,198.98** |
| Health Insurance | | | | | $4,094.60 |
| Dental Insurance | | | | | $388.00 |
| Vision Insurance | | | | | $43.20 |
| 401(K) Percent Contribution | | | $7,500.00 | | $12,673.18 |
| **Taxes** | | | **$40,229.70** | | **$69,922.02** |
| Fed W/H | | | $25,850.00 | | $42,181.31 |
| FICA EE | | | $4,048.98 | | $9,114.00 |
| Fed MWT EE | | | $1,872.75 | | $3,057.31 |
| CA W/H | | | $7,755.00 | | $13,967.80 |
| CA DT EE | | | $702.97 | | $1,601.60 |
| **Post-Tax Deductions** | | | | | **$318.40** |
| Long Term Disability | | | | | $160.00 |
| Voluntary AD&D | | | | | $20.00 |
| Voluntary Life Insurance | | | | | $82.40 |
| Marketing Chargebacks | | | | | $56.00 |
| | **Routing #** | **Account #** | **Amount** | | **Amount** |
| **Net Pay** | | | **$77,270.30** | | **$123,780.32** |
| Direct Deposit | 121122676 | XXXXXXXX0170 | $77,270.30 | | |

| **Other Payroll Information** | |
|---|---|
| 401K Eligible Wages | $125,000.00 |

| **Accruals & Balances** | |
|---|---|
| 1 Vacation - Hours Balance: | 0.00 Hours |
| 2 Sick Balance: | 0.00 Hours |
| CSPSL Balance: | 80.00 Hours |
| Volunteer Time Balance: | 0.00 Hours |

# Exhibit 5

David Locke Breaux

September 15, 2023

Doug Burton
Guaranteed Rate
315 S. Beverly Drive, Suite 320
Beverly Hills, CA 90212

Dear Doug,

After mindful consideration, it is with a heavy heart that I am writing to formally announce my resignation from Guaranteed Rate.

While it has been a privilege working with you and the team at Guaranteed Rate, I have decided to pursue new opportunities that align better with my career goals. Specifically, I believe I can offer more competitive rates elsewhere, which will allow me to provide better service to my clients and grow my career further. I know that both GR and I did all we could to make it work and I've held in as long as I can, but I now must try something else.

I want to express my sincere gratitude for the support, mentorship, and the wonderful experiences I've had during my time here. Working under your tutelage has been invaluable, and I am grateful for the knowledge and skills I've gained. You are always available to your team; your knowledge for policy and procedure is vast, and I always felt heard. So, thank you.

Please know that I am committed to ensuring a smooth transition and will take the Firm's direction on how to best do that. I am happy to assist in any way necessary to transfer my responsibilities and help the team continue to succeed.

Thank you again for everything, Doug. I wish you and the entire team at Guaranteed Rate continued success and prosperity.

Respectfully yours,

David

3027 Monte Sereno
Palm Springs, CA 92264

# Exhibit 6

guaranteed Rate

# DAVID BREAUX

# SALES COMPENSATION PLAN — ADDENDUM 3

THIS addendum to the Sales Compensation Plan ("Addendum") is effective as of the date provided in the footer below ("Effective Date").

The purpose of this Addendum is to identify and confirm loan pricing requirements, commission rates, and other details of your compensation as of the Effective Date and moving forward. The items specifically addressed in this Addendum supersede and replace any conflicting details addressed in your Sales Compensation Plan ("Plan") dated February 17th, 2020 and any prior addenda. Anything not addressed or defined in this Addendum will remain the same as was detailed in the Plan or previous addenda.

**NOW THEREFORE**, you and the Company agree as follows:

1. **CORPORATE OBJECTIVE –** You agree that you will price all loans originated by you so that the net revenue received by the Company from the origination of each loan you originate (after all costs, rate lock extensions, third party fees, etc. are paid, but prior to the payment of the VP's commission) is equal to or greater than your chosen Corporate Objective at the time the loan is funded. The Corporate Objective is a fixed number of basis points (% of total loan amount) of the credit extended to the borrower.

   If a loan funds at or above your Corporate Objective, after accounting for all costs and fees, and if all other conditions detailed in the Plan are satisfied, you will received a fixed number of basis points—based on a percentage of your chosen Corporate Objective.* Other processes/structures may apply to brokered loans and unique loan products.

   **Your Corporate Objective, Commission Split, and Compensation Floor/Ceiling, if any, are as follows:**

**CORPORATE OBJECTIVE: 130 BPS**

| Units | BPS | Commission Split (%) | Floor ($115,384.62) | Ceiling ($500,000.00) | Loans Funded until 3/31/2021 BPS | Loans Funded Until 3/31/2021 Ceiling ($500,000.00) |
|---|---|---|---|---|---|---|
| 1 + | 78 | 60% | $900.00 | $3,900.00 (Net Min to Company $6,500.00) | 117 | $5,850.00 (Net Min to Company $6,500.00) |

| Loans Funded 4/1/2021-2/28/2022 BPS | Loans Funded 4/1/2021-2/28/2022 Ceiling ($500,000.00) |
|---|---|
| 104 | $5,200.00 (Net Min to Company $6,500.00) |

***Any change to your Corporate Objective and/or your Commission Split must be approved in advance by executive management***

2. If you originate a loan that does not meet your Corporate Objective, the Company may, in its sole and absolute discretion, refuse to close and/or fund such loan. If Company elects to close and fund the such loan, you understand and agree that you will be ineligible to earn commission on that loan and that Company is closing and funding the loan solely as an accommodation.

**I agree that the above accurately reflects my understanding of the terms of my compensation. I also agree that I must originate all loans at or above my Corporate Objective (after accounting for all loan-related costs and fees) in order to become eligible to earn commission on the loan.**

David Breaux: (print name) David Breaux

DocuSigned by:

518DBF8C05B9484...

Employee Signature

Date: 04/27/2020

# Exhibit 7

guaranteedRate

# DAVID BREAUX
# SALES COMPENSATION PLAN — ADDENDUM 5

THIS addendum to the Sales Compensation Plan ("Addendum") is effective as of the date provided in the footer below ("Effective Date").

The purpose of this Addendum is to identify and confirm loan pricing requirements, commission rates, and other details of your compensation as of the Effective Date and moving forward. The items specifically addressed in this Addendum supersede and replace any conflicting details addressed in your Sales Compensation Plan ("Plan") dated February 17th, 2020 and any prior addenda. Anything not addressed or defined in this Addendum will remain the same as was detailed in the Plan or previous addenda.

**NOW THEREFORE**, you and the Company agree as follows:

1. **CORPORATE OBJECTIVE –** You agree that you will price all loans originated by you so that the net revenue received by the Company from the origination of each loan you originate (after all costs, rate lock extensions, third party fees, etc. are paid, but prior to the payment of the VP's commission) is equal to or greater than your chosen Corporate Objective at the time the loan is funded. The Corporate Objective is a fixed number of basis points (% of total loan amount) of the credit extended to the borrower.

   If a loan funds at or above your Corporate Objective, after accounting for all costs and fees, and if all other conditions detailed in the Plan are satisfied, you will received a fixed number of basis points—based on a percentage of your chosen Corporate Objective.* Other processes/structures may apply to brokered loans and unique loan products.

   **Your Corporate Objective, Commission Split, and Compensation Floor/Ceiling, if any, are as follows:**

## CORPORATE OBJECTIVE: 130 BPS

| Units | BPS | Commission Split (%) | Floor ($115,384.62) | Ceiling ($961,538.46) | Loans Funded until 3/31/2021 BPS | Loans Funded Until 3/31/2021 Ceiling ($961,538.46) |
|---|---|---|---|---|---|---|
| 1 + | 78 | 60% | $900.00 | $7,500.00 (Net Min to Company $12,500.00) | 117 | $11,250.00 (Net Min to Company $12,500.00) |

| Loans Funded 4/1/2021-2/28/2022 BPS | Loans Funded 4/1/2021-2/28/2022 Ceiling ($961,538.46) |
|---|---|
| 104 | $10,000.00 (Net Min to Company $12,500.00) |

***Any change to your Corporate Objective and/or your Commission Split must be approved in advance by executive management***

2. **Corporate Objective Shortfall.** You may ***not*** price a loan that will result in a Corporate Objective Shortfall unless approved in writing by the Company's Exception Desk. You understand and acknowledge that any such approval will be granted only under limited circumstances that comply with applicable Requirements. If You price a loan that would result in a Corporate Objective Shortfall without written approval from the Company's Exception Desk, the loan will not be considered an Eligible Loan, and the Company may, in its sole discretion, either refuse to close or fund that loan, or reassign the loan to a Company-selected loan originator.

**I agree that the above accurately reflects my understanding of the terms of my compensation. I also agree that I must originate all loans at or above my Corporate Objective (after accounting for all loan-related costs and fees) in order to become eligible to earn commission on the loan.**

David Breaux: (print name) David Breaux

DocuSigned by:
David Breaux
518B3F0095D0484...
Employee Signature

Date: 01/07/2021